ARKANSAS COMMUNITY ORGANIZA-
TION FOR REFORM NOW
et al., Plaintiffs,

v.

Claude S. BRINEGAR, Individually and
as Secretary of the U. S. Department of
Transportation, et al., Defendants.

No. LR-73-C-292.

United States District Court,
E. D. Arkansas, W. D.

July 28, 1975.

John T. Lavey, Philip D. Peters, Little Rock, Ark., for plaintiffs.

Thomas B. Keyes, W. H. Dillahunty, U. S. Atty., O. H. Storey, III, Asst. U. S. Atty., Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

HENLEY, District Judge Sitting by Designation.

This is a suit for declaratory and injunctive relief brought by Arkansas Community Organization for Reform Now (ACORN) and seven individual members of that organization who reside in the eastern part of the City of Little Rock, Arkansas. The defendants are the Secretary of the United States Department of Transportation, the Administrator of Region 6 of the Federal Highway Administration (FHWA), the Division Engineer of the Department of Transportation, the individual members of the Arkansas State Highway Commission, and the Director of the Arkansas State Highway Department. The City of Lit-

tle Rock, the Little Rock Public School District, and the Arkansas Baptist Medical Center have been permitted to intervene in the case as defendants. Certain civic organizations have been recognized as amici curiae.

ACORN is a non-profit unincorporated association dedicated to the interests of people of middle or low incomes. ACORN and its members who are plaintiffs herein seek to halt or at least delay the construction of Interstate Highway 630 (I–630), commonly referred to as the Wilbur D. Mills Freeway, which is designed as a six lane, controlled access, divided expressway for motor vehicular traffic traversing the City of Little Rock from east to west between I–30 and I–430. When and if the project as now planned is completed, its eastern terminus will be an interchange with I–30 in the eastern part of Little Rock very close to McArthur Park in the vicinity of which the seven individual plaintiffs reside. The western terminus will be an interchange with I–430 in the immediate vicinity of the new Baptist Medical Center and related health care facilities.

The plaintiffs claim that the draft and final environmental impact statements (EIS) prepared by the Arkansas State Highway Department and approved by FHWA do not meet the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., particularly §§ 4331 and 4332. They claim further that the project involves the constructive use of McArthur Park and Kanis Park, and that the Secretary of Transportation has not made the finding required by § 4(f) of the Transportation Act of 1966, 49 U.S.C. § 1653(f), and § 18(a) of the Federal-Aid Highway Act of 1968, 23 U.S.C. § 138, with respect to either park. A further claim is that the project will involve the physical relocation of a substantial number of people, and that the State Highway Department has not adequately discharged its obligations under the Uniform Relocation Assistance and

Real Property Acquisitions Act of 1970, 42 U.S.C. § 4601 et seq.

Jurisdiction is based primarily upon the Administrative Procedure Act, 5 U.S.C. § 701 et seq. And plaintiffs also refer to other jurisdictional statutes, namely 28 U.S.C. §§ 1331(a), 1337, and 1361. Plaintiffs seek a declaratory judgment in line with their contentions, appropriate injunctive relief, and an award of attorney's fee and costs.[1]

The defendants and intervenors do not contend that the Court lacks subject matter jurisdiction. They do contend that the claims of the plaintiffs are entirely without merit, and they affirmatively allege that plaintiffs have been guilty of laches which precludes them from successfully maintaining the action. They pray that the complaint be dismissed in its entirety.

The case has been tried to the Court and submitted on a voluminous record, including a transcript of the testimony taken before the Court, depositions, and documentary exhibits. The Court has also had the benefit of thorough post-trial briefs submitted by the respective parties. This Memorandum incorporates the Court's findings of fact and conclusions of law.

The concept of an east-west expressway through Little Rock came into existence at least as far back as 1948, and the concept has been confirmed by a number of traffic studies that were made between 1959 and 1964. With the passing of the years the need for such a thoroughfare has become more pressing due to the westward migration of people from the eastern and central parts of the City to the western parts and into the suburbs and rural areas west of town. The final EIS which plaintiffs challenge here recites, and the Court finds, that existing east-west streets in Little Rock are simply inadequate to handle existing traffic efficiently and comfortably, and that the situation is getting worse with the passage of time.

Since the initial conception of the project the view of the planners has been that the proposed expressway should run through a rather wide corridor traversing the City in the direction indicated, and the specific route that has been chosen runs for some distance along the line of West Eighth Street,[2] and until the project was taken into the interstate highway system it was sometimes called the "Eighth Street Expressway."

As early as 1958 the City and the State Highway Department entered into an agreement for the construction of the project as part of the state highway system; under the terms of that agreement the City was supposed to acquire and furnish right of way to the Department. Prior to November, 1970 some right of way had been acquired and a very limited amount of construction work had been done. However, the project languished because of the inability of the City to find funds for the acquisition of right of way. The record reflects that

1. A small portion of the project had been completed prior to the filing of the suit in November, 1973 and is now in public use. Plaintiffs prayed for preliminary as well as permanent injunctive relief. While no preliminary injunction was issued by the Court, there has been no substantial construction work on the project since the commencement of the action.

2. The Court notes at this point that street numbering in Little Rock is based on the intersection of Main and Markham Streets in downtown Little Rock. Main Street runs north and south and begins at the Arkansas River. Markham Street is an arterial east-west street and is one of the few existing streets handling through traffic from eastern to western Little Rock and beyond. Subject to certain exceptions and qualifications not here pertinent, streets running from east to west are numbered whereas streets running north and south are named. West Eighth Street, just mentioned in the text, is seven blocks south of Markham Street and is west of Main Street. East Eighth Street and other numbered streets, the numbers of which are prefixed by "East", are located east of Main Street. The portion of Little Rock lying east of Main is sometimes referred to as the "East Side" of the City.

prior to the incorporation of the project into the interstate system, the City had been able to raise from various sources, including a bond issue and general City revenues, the sum of $3,165,116.00. Of that sum $2,692,671.00 was spent on right of way acquisitions; $17,670.00 was spent on the construction of an underpass at Fair Park Boulevard near War Memorial Park in the western part of town; $204,574.00 was spent on retaining walls, paving grades, and similar items; and $240,000.00 was spent on relocating certain business and recreational facilities and the United States Naval Reserve training facility.

In November, 1970 FHWA agreed to take the project into the interstate system, and it thus became eligible for federal funds subject, of course, to requirements of federal law, including NEPA and related statutes.

The project as now planned will pass through residential and business districts and through areas of the City where numerous health, educational, and recreational facilities are located and where many doctors and dentists have their clinics or offices. The freeway will run to the south of and fairly close to St. Vincent's Infirmary, a large Roman Catholic hospital, War Memorial Park, the Arkansas State Hospital for Nervous Diseases, and the University of Arkansas Medical Center which includes the University Hospital, and the University's Schools of Medicine, Nursing and Pharmacy.

No part of any public park is being taken physically for use in connection with the project, but the freeway will either border or run very close to the south line of McArthur Park and will constitute the north boundary of Kanis Park which is located in the western part of the City between Rodney Parham Road and Barrow Road. Kanis Road, which is a continuation of West Twelfth Street, lies to the south of Kanis Park and for a short distance constitutes the southern boundary of the park.

The total distance that will be traversed by the freeway is about seven miles, but only a little over two miles are now open to the public. The segment now in use runs from University Avenue, a major street running from north to south, east to about Dennison Street which is another north-south street.

While it may not be strictly accurate to do so, the Court will refer to the part of the project east of Dennison as the "eastern half" of the project, and to the part of the project west of University as the "western half" of the project. While a good deal of work has been done in the western half of the project, nothing substantial by way of construction has been done in the eastern half. It should be said, however, that the project will involve the relocation of the Parham Elementary School which is located near the southwest edge of McArthur Park, and this involvement is what caused the Little Rock School District to intervene in the case. Plans have been made to relocate the school and funds for the relocation will be available as soon as certain property can be acquired by the State Highway Department.

While this case involves the entire project, the real controversy between the parties centers on the eastern half which, as indicated, includes McArthur Park, and it also includes the historic Mt. Holly Cemetery which is still in use and to which the freeway will pass in close proximity.

The focusing of the controversy on the eastern half of the project arises from two facts. In the first place the individual plaintiffs in the case who claim that they will be affected adversely by the project reside substantially east of Dennison. In the second place, as has been seen, this project or one like it has been in contemplation for nearly thirty years, and as Little Rock has grown to the west and southwest, municipal zoning and real estate development have assumed that the project would be

constructed sooner or later; consequently the western half of the project will have substantially less immediate adverse impacts on individuals, neighborhoods, and business establishments than may be anticipated with respect to the eastern half of the project. And as a matter of fact, the plaintiffs did not call a single witness adverse to the project who resides west of Dennison.

When the project was incorporated into the interstate system it was conceived as a four lane expressway running from I-30 to I-430. However, some months after its incorporation into the system, it was agreed that the project would be a six lane highway for its entire length.

By January 19, 1972 a draft EIS had been prepared by the Arkansas State Highway Department, and on that date it was submitted to FHWA. The federal agency on the same day approved the draft for circulation and comment.

Design hearings were held in March, 1972 and were attended by a number of individuals who were permitted to express their views. Comments by mail were also invited and received. No representative of ACORN attended the hearings, but ACORN did submit a written statement in opposition to the project.

The final EIS was submitted by the Highway Department on December 4, 1972 and was approved by FHWA on December 8, 1972. The design for the project was finally approved on May 8, 1973, and the University-Dennison segment was opened for traffic on May 26, 1973. This suit was filed on November 9, 1973.

### I.

The Court takes up first the claim of the defendants that plaintiffs are barred from maintaining this suit by laches. The period of delay relied upon would appear to be from December, 1972 to November, 1973.

The availability of laches as a defense in an equitable action presupposes that the plaintiff has delayed unreasonably the commencement of his suit and that the unreasonable delay has prejudiced the defendant. While laches may be a defense in a suit of this kind, it is not looked upon with any particular judicial favor in view of the public interests involved. *Steubing v. Brinegar,* 511 F.2d 489 (2d Cir. 1975); *Lathan v. Brinegar,* 506 F.2d 677 (9th Cir. 1974); *Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314 (8th Cir. 1974); *Environmental Defense Fund[3] v. Tennessee Valley Authority,* 468 F.2d 1164 (6th Cir. 1972).

The delay in the commencement of the suit has been explained satisfactorily by the testimony of Wade Rathke, the Chief Organizer of ACORN, and Mrs. John A. Vogler, one of the plaintiffs. The delay was due in part to the unsuccessful efforts of ACORN to obtain help, financial and other, from environmentalist groups like the Environmental Defense Fund and the Sierra Club and in part to the fact that preparation of a case of this kind necessarily consumes a substantial amount of time since much research and investigation must be done prior to the filing of the suit.

Nor have the defendants shown that they have been prejudiced by the delay. The project could not have been completed by November, 1973, and work on it in fact continued until the suit was filed.

So, the claim of laches will be rejected.

### II.

The Court will next consider the claim of the plaintiffs that the failure of the Secretary to file with respect to either

---

3. The Environmental Defense Fund is a powerful organization of environmentalists and others professing an interest in ecology. It is a frequent litigant in cases like this and will be referred to for convenience in citation as "EDF".

McArthur Park or Kanis Park the statement allegedly required by 49 U.S.C. § 1653(f) and 23 U.S.C. § 138, which statement counsel refer to as a "section 4(f) statement", entitles them to injunctive relief until such time as the Secretary files a proper statement or proper statements and until such statement or statements can be reviewed by the Court under the Administrative Procedure Act. *Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L. Ed.2d 136 (1971).

The statutes invoked by plaintiffs provide that no part of a public park may be "used" for federal highway purposes unless and until the Secretary finds affirmatively there is no feasible or prudent alternative to the use and that all possible planning has been done to minimize harm to the park.

The plaintiffs say that while the freeway will not run through either of the parks in question, it will lie so close to them that the adverse environmental impacts to be expected from the use of the freeway will be so severe as to amount to a "constructive use" of both parks. Counsel for plaintiffs cite in support of their position *Brooks v. Volpe*, 460 F.2d 1193 (9th Cir. 1972), and *D. C. Federation of Civic Associations v. Volpe*, 148 U.S.App.D.C. 207, 459 F.2d 1231 (1971), *cert. denied*, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972). Counsel for the defendants contend that the constructive use doctrine is not applicable to parks like McArthur and Kanis, and that in any event the project will not make any constructive use of either park.

The Court does not agree with the defendants that the constructive use doctrine recognized in *Brooks* and *Civic Associations, supra,* is not as an abstract proposition applicable to the two parks with which the Court is concerned. As the Court reads the statute, the obligation of the Secretary to make a "section 4(f)" finding does not depend on the size or nature of the park. If the park is a public park, it simply cannot be used actually or constructively for federal highway purposes until a proper statutory finding has been made.

The Court considers that on this phase of the case the burden is on the plaintiffs to establish by a preponderance of the evidence that the project will involve a constructive use of the respective parks. *Cf. Sierra Club v. Lynn*, 502 F.2d 43, 52 (5th Cir. 1974); *Sierra Club v. Callaway*, 499 F.2d 982, 992 (5th Cir. 1974); *EDF v. Corps of Engineers, U. S. Army*, 492 F.2d 1123 (5th Cir. 1974).

As far as McArthur Park is concerned, the question is not free from difficulty. McArthur Park is an old park and is not without historical significance in Little Rock. The area occupied by the park was the site many years ago of a United States Army Arsenal, and the late General Douglas McArthur was born in one of the arsenal buildings while his father, General Arthur McArthur, was stationed in Little Rock prior to the turn of the century. Apart from its historical value, the park is not without significance from the standpoint of culture and recreation for both adults and children. The buildings within the borders of the park house a museum, a restaurant, the Arkansas Arts Center, a theatre and perhaps other facilities. The individual plaintiffs all live near the park, and one of the plaintiffs, Mrs. Vogler, lives directly across East Ninth Street from it, and she and her family make extensive use of the park facilities.

East Ninth Street, which is an arterial east-west street, borders the park on the north. A short distance east of the park is the existing Highway I–30, and I–630 when completed will interchange with I–30 at a point very near the southeast corner of the park. The north line of the project right of way will be contiguous with the south border of the park for some distance and will be quite close to that border even where not contiguous with it.

While the Secretary has made no formal statutory finding with respect to the park, the draft and final impact statements dealing with the project discuss to some extent the effect of the project on the park and what is proposed to be done to minimize any ill effects that the project may have on the park.

The Court finds that users of the park today are subject to noise and air pollution emanating from East Ninth Street and I–30, and it is obvious that the project will add somewhat to that noise and pollution.

■ However, the Court is not persuaded by a preponderance of the evidence that the park will be impacted by the project to the extent that the impacts will amount to a constructive use of the park. The principal facilities available to users of the park are located a substantial distance north of the proposed route of the freeway and are closer to East Ninth Street than they are to the freeway route. And the Court thinks that the users of the park and its facilities will not be substantially affected by the project's increase of noise and air pollution over those to which the park users are subject already. There is no reason to believe that the project and the traffic on it will have any adverse effect on the park itself. The sight of the freeway and traffic thereon moving along the south border of the park may be displeasing visually to some people, but part of the freeway in the vicinity of the park will be below ground level, and it is the plan of the defendants to landscape the right of way in the vicinity of the park so as to mitigate any adverse visual impact resulting from the project.

Another consideration, perhaps minor but worth mentioning, is that when I–430 is finally completed from its origin north of the Arkansas River to its connecting point with I–30 southwest of Little Rock, a large volume of traffic will be able to by-pass Little Rock to the west, which is not now possible, and the

process may be expected measurably to lighten the traffic burden on I–30 by eliminating the necessity which now exists with respect to many motorists and truck drivers who from a practical standpoint are required to go all the way through Little Rock and North Little Rock on I–30 in order to continue their journeys to points beyond the Greater Little Rock area.

Accordingly, the Court concludes that no statutory finding by the Secretary is required with respect to McArthur Park. However, the Court will have somewhat more to say about McArthur Park in a later section of this Memorandum.

If the Court is correct in its finding and conclusion with respect to McArthur Park, then *a fortiori* no statutory finding is required with respect to Kanis Park. Kanis Park is a comparatively new park and is located in the western part of the City; it is not within close proximity to any completed freeway. The traffic on Mississippi Avenue, the park's east border, would not appear to be comparable in that area to the traffic on East Ninth Street adjacent to McArthur Park; and much of the existing traffic on Kanis Road to the south of the park will be eliminated by the construction of the freeway. From the map of the project that is before the Court it appears that the western border of Kanis Park will be somewhat more than a mile and a half from I–430 which is west of the park.

■ Moreover, the defendants did not locate the route of the project along the north border of Kanis Park; the park was located by the City after the route of the freeway had been determined and with full knowledge and expectation that the freeway would be built along the line now contemplated. Thus, it may fairly be said that the City is making a constructive use of the freeway to improve access to the park rather than that the defendants are about to make a constructive use of the park.

Before leaving this aspect of the case the Court will note that regardless of

adverse impacts that the freeway may have on either park, it will markedly improve public access to both parks, and will in all probability substantially increase their use.

### III.

The Court will next consider the claims of plaintiffs based on the Uniform Relocation Assistance And Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601 et seq. That statute went into effect a little less than two months after the project was taken into the interstate system but many years after the project had been conceived and the route of the freeway determined. The Court finds that the claims of the plaintiffs based on the statute are without merit and should be rejected.

The record reflects that in years prior to the passage of the Act and prior to any construction on the project the Little Rock Urban Renewal Agency and the Little Rock Housing Authority began to acquire by purchase or condemnation substantial areas of land in Little Rock lying within the path of the contemplated expressway. Much of that land which will be incorporated into the project is and has been vacant, and the people who lived there have long since moved away. Generally, that vacant land which is now available for the project lies in the eastern half of the freeway.

In view of the history of the project and of real estate development in western Little Rock in anticipation of the project, its implementation probably affected substantially fewer people in the western half of the project than have been or will be affected in the eastern half. Here again, the problem centers in the half just mentioned. The Court doubts that relocation is any substantial problem in the western half of the project.

The record reflects that since the passage of the 1970 Act, the State Highway Department has acquired a good deal of right of way in the eastern half of the project, and that acquisitions on a voluntary basis are continuing. However, there are still numerous people residing in the eastern half of the project who sooner or later are going to have to move if the project is allowed to proceed to completion.

 Under the 1970 Act, the State Highway Department has definite obligations to and responsibilities with respect to persons the relocation of whom is made necessary by construction of the project. The defendants admit that those obligations and responsibilities exist and that they must be discharged before right of way acquisitions can be federally funded. The defendants say, however, and the Court finds that the responsibilities and obligations of the Department under the Act do not have to be discharged at one time with respect to all of the people who may have to be relocated as construction proceeds. In other words, relocation can proceed in an orderly manner, and ordinarily the Highway Department is not required to relocate a homeowner today if his property will not be required for the project until, say, late 1976 or 1977.

 The Court finds with respect to relocation that whether the plans of the Highway Department are adequately described in the draft and final EIS or not, adequate and appropriate plans exist and are being implemented as the occasion for implementation arises in various segments of the project.

In point of fact, the Court knows from the testimony of some of the plaintiffs and as a matter of common sense based on the Court's familiarity with the section of Little Rock that is primarily involved in this controversy, that many of the people who live in the eastern half of the project and who will have to move if the project proceeds, are elderly people, and that many of them have occupied their present homes for many years. Probably a good many of these people are not so much concerned with the Highway Department's "reloca-

tion plans" or with the publicity given to those plans as they are with the fact that they are going to have to move, which is something that they simply do not want to do.

The Court is not without sympathetic understanding of the attitude of these settled residents, but assuming compliance with the law by the defendants there is nothing that the Court can do for them ultimately. While they may refuse to sell their properties voluntarily and while they may refuse relocation aid, in the last analysis their land, like that of anyone else, is subject to the Highway Department's power of eminent domain in the exercise of which private property may be taken for public use upon the payment of just compensation therefor.

### IV.

This brings the Court down to the plaintiffs' attack on the draft and final EIS that were prepared by the State Highway Department, at least as far as authorship is concerned, and approved by the FHWA. Discussion of the issue may conveniently start with the observation that there is no question in this case that the project is subject to the requirements of NEPA, that a draft and final impact statement were required with respect to the project, that the statements had to meet the requirements of 42 U.S.C. § 4332 and guidelines promulgated thereunder, and that the statements that were submitted are subject to judicial review by this Court under the Administrative Procedure Act.

In a case arising under § 4332 a federal court is required to perform two functions. It must determine first whether an EIS is adequate as a statement; if that question is answered in the affirmative the court is then required to go further and engage in a limited substantive review of agency action based on the EIS, and to set that action aside if it was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. 5 U. S.C. § 706(2)[(A)–(D)]; *Citizens to Preserve Overton Park v. Volpe, supra; Minnesota Public Interest Research Group v. Butz, supra; Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849 (8th Cir. 1973); *EDF v. Froehlke,* 473 F.2d 346 (8th Cir. 1972);[4] *EDF v. Corps of Engineers, U. S. Army,* 470 F.2d 289 (8th Cir. 1972).[5]

In speaking of the adequacy of an EIS and of what it must contain, the court of appeals for this circuit has used language that has varied somewhat from case to case. However, when the cases just cited are considered collectively, their holdings may be summarized substantially as follows:

A final EIS is required to be sufficiently thorough and detailed to afford an adequate basis for agency action and to enable a court to exercise its review function under the Administrative Procedure Act. It must be sufficiently detailed to demonstrate to interested

---

4. There are two Eighth Circuit cases in which Environmental Defense Fund was plaintiff and in which Secretary of the Army Froehlke was defendant. The case just cited in text and which may be called Froehlke I arose in Arkansas and involved the so-called Cache River-Bayou DeView Project; the second case, *EDF v. Froehlke,* 477 F. 2d 1033 (8th Cir. 1973), which may be called Froehlke II, arose in the Western District of Missouri and involved the construction of the Truman Dam on the Osage River.

5. That case involved the construction of the Gillham Dam across the Cossatot River in Western Arkansas. The decision affirmed the final order of District Judge Garnett Thomas Eisele dissolving an injunction that he had previously issued restraining the Corps of Engineers from proceeding with construction of the dam until an adequate EIS was filed. *EDF v. Corps of Engineers, U. S. Army,* 342 F.Supp. 1211 (E.D.Ark. 1972). For earlier opinions of Judge Eisele dealing with the Gillham Dam Litigation see *EDF v. Corps of Engineers, U. S. Army,* 325 F.Supp. 749 (E.D.Ark.1971), and *EDF v. Corps of Engineers, U. S. Army,* 325 F.Supp. 728 (E.D.Ark.1971).

parties, the public, and the courts that the agency gave objective and full consideration to the impacts of the project on the environment; that adequate cognizance has been taken of adverse environmental impacts and that means of eliminating or mitigating such impacts have been explored seriously; that due consideration has been given to reasonable alternatives, including the alternative of not starting or of discontinuing the project; and that there has been a realistic comparison between the benefits to be derived from the project and the costs, including environmental costs, that the project will entail.

 While the requirements imposed by § 4332 are strict, they are not inflexible, and they should be given a reasonable interpretation. Appropriate regard should be had to the nature and scope of the project and to the magnitude of its environmental impacts. *Iowa Citizens for Environmental Quality, Inc. v. Volpe, supra,* 487 F.2d at 852-53. Obviously, some projects require more detailed impact statements than do others; and with respect to some projects there are more viable alternatives than there are with respect to other projects.

 Finally, while the judicial inquiry into the sufficiency of an EIS and the propriety of agency action based on it must be "searching and careful, the ultimate standard of review is a narrow one." *Citizens To Preserve Overton Park v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 824. And the court "is not empowered to substitute its judgment for that of the agency." *Ibid.*

In attacking the draft and final statements submitted by the defendants the plaintiffs charge first that the statements are the products of the Arkansas State Highway Department to which Department FHWA had impermissibly delegated its own responsibility to prepare the statements and had simply rubber stamped the statements prepared by the Highway Department, and plaintiffs

contend further that in any event both statements are inadequate. The defendants contend that the statements are legitimate as far as preparation is concerned and are adequate.

From its consideration of the record including the statements themselves the Court finds that the plaintiffs are entitled to declaratory relief and to some injunctive relief. The Court finds the statements to be inadequate particularly in the area of alternatives and alterations relating to the design of the project, and the Court concludes that the statements will have to be rewritten and probably subjected to later judicial consideration although not necessarily by this writer.

 The views just stated render it possible for the Court to assume for purposes of discussion that the preparation and approval of the statements did not involve any unlawful and impermissible delegation of federal responsibility to the State Highway Department. More specifically, the assumption is that Highway Department participation did not transcend the limits permitted by the majority of the panel of Eighth Circuit judges which decided *Iowa Citizens for Environmental Quality, Inc. v. Volpe, supra.* The majority opinion was cited with approval by the Court of Appeals for the Fifth Circuit in *Sierra Club v. Lynn, supra,* 502 F.2d at 59. However, the Court now strongly suggests to the defendants that when new statements are prepared, they be not unmindful of Judge Lay's dissent in *Iowa Citizens, supra,* and of the holdings of the Second Circuit in *Conservation Society of Southern Vermont v. Secretary of Transportation,* 508 F.2d 927 (2d Cir. 1974), and *Greene County Planning Board v. Federal Power Commission,* 455 F.2d 412 (2d Cir. 1972).

Turning now to the question of the adequacy of the statements, the Court thinks that in fairness to the defendants there are some preliminary comments that should be made.

To start with, the statements before the Court are comparatively early statements. The draft EIS was prepared during 1971, and the final statement was prepared in 1972 after the design hearings were held in March of that year. It is true that during those years certain guidelines had been laid down as to what impact statements are required to contain, but it is probably equally true that during those years actual highway planners lacked the expertise in organizing and writing impact statements that they presumably have acquired by this time. Moreover, much of the decisional law dealing with impact statements was not laid down until late 1972 and thereafter.

Another thing to be mentioned is that those concerned with preparing these statements were not writing on a clean slate. As has been seen, they were dealing with a project that was old in concept and had crystallized down through the years at least as far as route was concerned, and they were obviously aware that large scale public and private decisions had been made and actions taken in reliance upon the completion of the project.

As a final preliminary comment, the Court will observe that the environmental impacts to be expected from this project are simply not comparable to the impacts to be expected from other projects, of other types, and in other surroundings. The freeway is not going to invade any wilderness area or destroy any vistas of great scenic beauty, or substantially affect any fish or animal life. The project does not involve the destruction or material change of any large and significant ecosystem. All that this project involves is the construction of an expressway for motor vehicles through an urban area already troubled by traffic congestion, air pollution, and noise.

Down to a point the Court has no trouble with the statements. They purport to cover the ground set out in NEPA and relevant guidelines, and in certain respects they cover that ground adequately.

The statements describe the project, the need for it, and the benefits expected to be derived from it. They expressly recognize the adverse environmental impacts that will result from the project, and they set out in general terms what the planners contemplate doing about those impacts. And the statements reflect that the planners received information from what should have been reliable sources to the effect that certain other impacts which might have been expected will not in fact result.

In the Court's estimation the reports break down basically in their dealing with alternatives. Those who prepared the statements seem to have been of the view that the only alternative to the project as designed by 1971 was abandonment.

The Court agrees with the defendants that as far as route is concerned, there is really no feasible alternative to the route selected for the freeway. And the Court does not consider that the plaintiffs are really quarreling about the project's route.

But it appears to the Court that as far as the design and scope of the project are concerned, there are some alternatives that ought to be discussed in the new statements although the Court does not say at this point that any particular alternative must be discussed or that any alternative must necessarily be adopted.

For example, and for example only, the Court calls attention to the fact that plaintiffs' expert witness, Mr. Robert A. Burco, questioned in his testimony whether Little Rock really needs an expressway running all the way from I–30 to I–430, and whether Little Rock really needs a six lane expressway as compared to a four lane one, and whether it needs a six lane thoroughfare for the whole length of the project.

Another possible alternative that occurs to the Court and that relates to McArthur Park is that the route of the

freeway or part of the route in the neighborhood of the park might be varied somewhat so as to be further removed from the southern edge of the park. However, the Court recognizes that such a change of route might alter to some extent the plans for the relocation of the Parham School.

The Court wants to make it clear if it has not done so already that in mentioning certain alternatives that might be appropriate for discussion in the new statements the Court has made no effort to make any all exclusive or all inclusive list of design alternatives. In the last analysis it is for the defendants to say initially what alternatives should be discussed in the new statements.

The Court considers that the new statements should be more detailed in some areas. As in the case of the alternatives, the areas now about to be mentioned in the context of detailed discussion are mentioned by way of illustration and example.

One of the complaints made by the plaintiffs is that the present statements do not deal in any depth with noise and pollution. There is evidence to the effect that the defendants now have data and information which they did not have when the present statements were prepared. Those data plus any other additional data in the possession of the defendants as a result of their ongoing study and review of the project might well be included.

While the Court has found in an earlier section of this Memorandum that the Highway Department's plan for relocating people is adequate, it would probably not be amiss for the new statements to go into more detail on the subject of relocation and to state what has been done down to this time, and what remains to be done in the future, and the details of the Highway Department's program in this area.

And the Court thinks that even though no § 4(f) finding is required for either of the two parks that have been mentioned, the defendants might do well to say more about the parks than they have said in the statements now before the Court.

Although there are differences between the two halves of the project, and although the controversy seems to the Court to center on the eastern half, the new statements should probably cover the entire project from I–30 to I–430. *Cf. Indian Lookout Alliance v. Volpe*, 484 F.2d 11 (8th Cir. 1973).

When the new draft impact statement is prepared it should be properly circulated and publicized, comments about it should be solicited, and public hearings held with respect to it. The defendants should be disposed to listen sympathetically to reasonable suggestions and criticisms from citizens and citizen and business groups. Conversely, people and organizations, including the plaintiffs in this case, would do well to attend the hearings and express their views, and make their suggestions, and not sit idly by and wait until a new final impact statement is prepared and then attack it in court.

With further respect to hearings, comments, and suggestions, the Court would call attention to the opinions of Mr. Burco who has been mentioned as to the desirability of maximum citizen participation in the planning of projects like the one under consideration, and the Court will not presume that citizen participation in connection with the further development of this project would be fruitless, although the Court is well aware that if a group of persons is simply opposed in principle to any significant public construction project, they are not likely to be satisfied with any impact statement that may be prepared in connection with the project.

## V.

It is now necessary to consider the relief that should be awarded in the case.

The declaratory judgment aspect of plaintiffs' prayer for relief gives no trouble. Appropriate declarations will be made in line with the conclusions ex-

pressed in the first four sections of this Memorandum.

As to injunctive relief, the question of whether and to what extent such relief should be granted addresses itself ultimately to the judicial discretion of the Court, sitting as a court of equity. *Conservation Society of Southern Vermont v. Secretary of Transportation, supra; Minnesota Public Interest Research Group v. Butz, supra; EDF v. Callaway,* 497 F.2d 1340 (8th Cir. 1974); and *Froehlke II, supra.* While the Court has the power to enjoin all further construction work on the project until new and adequate impact statements are prepared and reviewed, the Court is not required to go that far. Depending on the factors present in a given case, a court in the exercise of its discretion may enjoin further prosecution of some construction while permitting other portions of the construction to proceed while proper impact statements are being prepared. *Froehlke II, supra.*

The Court will enjoin further construction east of Dennison until the problem of adequate impact statements is solved satisfactorily.

As far as land acquisition east of Dennison is concerned, it is the Court's understanding that the Little Rock School District is faced with time limits relating to funding and planning for the relocation of the Parham School and that relocation depends at least in part upon acquisition by the Highway Department of necessary real estate. Should it develop that the Department is not able to acquire the necessary property voluntarily, it may resort to condemnation; other acquisitions of real estate east of Dennison may proceed on a voluntary basis only.

The Court finds that it is not in the public interest to enjoin further construction west of University Avenue and will not enjoin such construction. Continuation of the work in that segment of the project is not going to inflict any immediate injury on anyone, and it certainly will not immediately injure the individual plaintiffs or other persons residing east of Dennison. On the other hand, further delay in construction west of University will substantially harm thousands of people in Little Rock who need an east-west expressway at least from I–430 to Dennison Street as soon as they can get it.

In deciding not to enjoin construction west of University the Court has given much weight to the existing situation with respect to the Baptist Medical Center and supporting facilities which have been located at the point where I–630 and I–430 will connect.

The health care complex at that location is centered around the Baptist Medical Center proper which includes a 584 bed hospital, the most modern in Little Rock, the Medical Towers Building which is a condominium constructed for the use of doctors, the Doctors Park Building which will house the offices of other doctors, and the Arkansas Diagnostic Clinic. The cost of the Medical Center itself including $1.5 million spent by the Center on the Medical Towers Building was $35.5 million. Doctors who have bought or will buy space in the Medical Towers Building have spent or will spend some $4.5 million in that connection.

The only hospital emergency service now available to the public in Little Rock is that supplied by the Medical Center and by St. Vincent's Infirmary. The emergency room previously operated by the Medical Center at its old Twelfth Street location has been closed, and the emergency room at Missouri Pacific Hospital on Cantrell Road is no longer operational.

The need for rapid access to the new Medical Center, including the need of people residing in eastern Little Rock, is obvious, and is not now available by means of existing roads and streets.

Enough has been said about injunctive relief, and the Court passes to a consideration of the claim of plaintiffs for an award of costs and an attorney's fee.

 As to costs, the Court finds that under the provisions of 28 U.S.C. § 2412, as amended, the federal defendants are subject to costs which are to be paid out of the Treasury of the United States, and costs will be allowed as against those defendants. Basically, the items of allowable costs are set out in 28 U.S. C. § 1920, and there are some other items of expenses which the Court may in its discretion tax as costs. In this connection the court refers to its opinion in *Cox v. Maddux,* 285 F.Supp. 876 (E. D.Ark.1968), where the subject of costs is discussed in some depth.

The Court finds it unnecessary to decide at the moment whether the state defendants are liable for costs. Plaintiffs are entitled to only one award of costs, and they should have no trouble collecting the award made against the federal defendants. If the government undertakes to secure indemnity or contribution for costs from the state defendants, it will be time enough to determine whether they or the State Highway Department should be held liable. *Cf. Edelman v. Jordan,* 415 U.S. 651, 94 S. Ct. 1347, 39 L.Ed.2d 662 (1974).

The mechanics of the taxation and ultimate allowance of costs against the federal defendants will be handled as provided by Rule 54(d) of the Federal Rules of Civil Procedure.

 Under the provisions of 28 U. S.C. § 2412 the Court is forbidden to award any attorney's fee against the federal defendants or the government. The statutes invoked by plaintiffs do not authorize the allowance of an attorney's fee in a case of this kind, and the Court has no authority to allow a fee on the theory that the suit has been in the public interest and that counsel for plaintiffs have served as a "private attorney general." *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (U.S. May 12, 1975). See also the amended opinion of the Court of Appeals for this Circuit in *Doe v. Poelker,* 515 F.2d 541 (8th Cir. 1975).

In *Alyeska, supra,* the Supreme Court recognized certain categories of cases in which a federal court may allow an attorney's fee to a successful litigant, but this case does not fall into any of those categories, and the prayer for the allowance of a fee will be denied.

A decree in accordance with the foregoing will be entered, and jurisdiction will be retained for all appropriate purposes. When the defendants consider that they have prepared adequate impact statements, they may apply to the Court for relief from the injunction that will be issued.