**SIERRA CLUB, et al., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF TRANSPORTATION, et al., Defendants.**

**No. C 86–3384 RFP.**

United States District Court, N.D. California.

July 7, 1988.

Law Offices of Maribeth Halloran, Robert J. Breakstone, Breakstone & Cotsirilos, Law Offices of Robert M. Teets, Law Offices of William S. Curtiss, Sierra Club Legal Defense Fund, San Francisco, Cal., for plaintiffs Sierra Club, Committee for Green Foothills.

Law Offices of Alan Moss, San Francisco, Cal., for plaintiffs Tyler Ahlgren and Dana Denman.

Paul E. Locke, Asst. U.S. Atty., Land & Natural Resources Div., San Francisco, Cal., for defendant U.S. Dept. of Transp.

Christine Motley, Deputy County Counsel, County Counsel of County of San Mateo, Redwood City, Cal., for defendant County of San Mateo.

## ORDER GRANTING SUMMARY JUDGMENT FOR PLAINTIFFS ON SECTION 4(f) CLAIM

PECKHAM, Chief Judge.

### INTRODUCTION

On January 12, 1987, this court enjoined construction of the proposed devil's slide bypass, based on a preliminary determination that the defendants had failed to comply with section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303(c) (1982), and section 18 of the Federal Aid Highway Act of 1968, 23 U.S.C. § 138 (1982). *See Sierra Club v. United States Department of Transportation,* 664 F.Supp. 1324, 1327–34 (N.D.Cal.1987). Section 4(f) requires that, before park land can be used by highway projects, the Secretary of Transportation must conduct a study to determine whether there are prudent and feasible alternatives to the proposed project, and whether all possible planning has been carried out to minimize harm to the park. Before us now are cross motions for summary judgment on the section 4(f) claim.

The facts as they are summarized below and in the court's previous opinion, *see id.,* are for the most part not disputed by the defendants. *See* Defendants' Responses to Requests for Admissions (filed Sept. 18 and Oct. 1, 1987). The defendants do attack certain of the court's preliminary factual and legal determinations. To the extent that there are factual disputes, they must be resolved in the defendants' favor for the purposes of plaintiffs' motion. The plaintiffs' motion for summary judgment will nevertheless be granted, because under the applicable law these factual disputes are not material.

### BACKGROUND

California State Highway Route 1, between Pacifica and Montara, is a scenic two-lane highway built along the cliffs overlooking the Pacific Ocean. Since Route 1 was constructed in 1937, landslides have repeatedly forced closure of a 600 foot segment of the highway commonly known as the Devil's Slide. The last major

closure lasted for 84 days in early 1983, when the roadbed sank five feet after severe winter storms.

The California Division of Highways began studying bypass alternatives for the Devil's Slide area as early as 1958. In 1960, the California Highway Commission approved a 6.8 mile bypass of Devil's Slide. This proposed route, which left the existing Route 1 at the south end of Pacifica and rejoined it at the north end of Half Moon Bay Airport, became known as the "adopted alignment alternative." Between 1969 and 1972, the California Department of Transportation ("CalTrans") acquired fifty-five percent of the right-of-way needed for the adopted alignment alternative. Construction of the adopted alignment alternative was enjoined by Judge William T. Sweigert, however, in order to compel compliance with newly-enacted federal environmental laws. *See Sierra Club v. Volpe*, 351 F.Supp. 1002 (N.D.Cal.1972). The defendants suspended their compliance efforts in 1975, due to a lack of funds. *See* State Defendants' Response to Requests for Admissions at 3–4.

In the late 1970's, the California Department of Parks and Recreation (DPR) began negotiations to purchase land situated on both sides of the adopted alignment alternative right-of-way. This land eventually became McNee Ranch State Park. The Public Works Board approved the purchase of the park land in 1979, and by 1981 the Department of General Services had completed eminent domain suits to acquire the land. In early 1984, the land was formally turned over to the DPR for administration as part of the state park system. *See* Federal Defendants' Brief at 13–14 & n. 16. At the time this land was acquired, the highway project was dormant and unfunded. However, the DPR was aware of the possibility that a highway might eventually be built between the two parcels of the park.

Federal funding was made available for a bypass project after Route 1 was severely damaged by winter storms in 1983. In March of 1983, CalTrans began to prepare a draft environmental impact statement for the bypass project. In 1985, however, the California Coastal Commission twice disapproved amendments to the San Mateo County Local Coastal Plan which were required by state law in order for construction to commence along the adopted alignment. In response, CalTrans abandoned the adopted alignment in favor of the "preferred" or "Martini Creek" alternative, which is the subject of the present suit. In February of 1986, the California Coastal Commission found that the Martini Creek alternative was consistent with the policies and objectives of the California Coastal Zone Management Program, thereby allowing the project to go forward. The federal defendants approved the Final Environmental Impact Statement [FEIS] on April 16, 1986.

As is set forth in the FEIS, the Martini Creek project is a 4.5 mile inland bypass with one lane in each direction plus a continual uphill passing lane on each side of the Saddle between San Pedro and Montara Mountains. At the top of the saddle cut, there would be four paved lanes for approximately three-tenths of a mile because each of the uphill lanes would continue over the top of the saddle and begin to descend before merging into a single downhill lane. There would be continuous vehicle recovery areas on the downhill side of the bypass except at the top of the saddle cut and over the four planned bridges. At three locations, there would be vehicle retention areas. The project would vary in width from approximately 79 to 108 feet. The four bridges would be 56 feet wide. The project would be located between the two parcels of McNee Ranch State park on the same right-of-way as the adopted alignment alternative, but it would turn west at the southern edge of the park and follow Martini Creek to rejoin the existing Route 1 just north of Montara.

It is estimated that total grading for the project would be 5.9 million cubic yards. The construction of the project will require seven "cuts" into the mountains greater than 150 feet deep, with the largest cut of 250 feet at the saddle between San Pedro and Montara Mountains. The lengths of these cuts will vary from approximately

350 to 2100 feet. The largest "fill" slope, on the north side of San Pedro Mountain, will be approximately 250 feet high. The cuts and fills will be visible to park visitors from various locations in the park, as will the highway itself.

## DISCUSSION

The plaintiffs' motion challenges the propriety of the Secretary of Transportation's decision not to conduct a section 4(f) study before approving the devil's slide bypass project. The Secretary's action was based on a determination that the proposed project would not have a significant adverse impact on the park. See FEIS, Administrative Record Item [A.R.] 653 at 143–152. In reviewing the propriety of the Secretary's action, we of course start with the language of the statute itself:

> The Secretary may approve a transportation program or project requiring the use of publicly owned land of a public park ... only if—(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park....

49 U.S.C. § 303(c) (1982). The Supreme Court and the Ninth Circuit have held that section 4(f) should be applied zealously to protect park land. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Alder v. Lewis,* 675 F.2d 1085 (9th Cir.1982); *Brooks v. Volpe,* 460 F.2d 1193 (9th Cir. 1972). In the face of this precedent, the defendants argue that section 4(f) should be read narrowly not to apply to highway projects that are jointly planned with parks. In the alternative, the defendants argue that even if section 4(f) applies, the devil's slide bypass would not constructively use McNee Ranch State Park.

### 1) Standard and Scope of Review

The standard for judicial review of the Secretary's determination not to conduct a 4(f) study is whether that action was " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " This standard does not shield the Secre-

tary's action " 'from a thorough, probing, in-depth review.' " A reviewing court must determine " 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Sierra Club,* 664 F.Supp. at 1329 (quoting *Citizens to Preserve Overton Park,* 401 U.S. at 412–13, 415, 416, 91 S.Ct. at 821–22, 823, 823).

As a general rule, courts must review agency action "by scrutinizing the administrative record at the time the agency made its decision." *Asarco v. EPA,* 616 F.2d 1153, 1159 (9th Cir.1980). However, there are a number of exceptions to this rule, even when the Agency's fact-finding procedures were adequate. The trial court has the discretion to receive additional evidence, including expert testimony, for certain limited purposes.

> If the reviewing court finds it necessary to go outside the administrative record, it should consider evidence relevant to the substantive merits of the agency action only for background information ... or for the limited purposes of ascertaining whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds of decision. Consideration of the evidence to determine the correctness or wisdom of the agency's decision is not permitted, even if the court has also examined the administrative record.

*Id.* at 1160 (citations omitted).

■ Under *Asarco,* we evaluate the merits of the Secretary's decision solely on the basis of the information that was before her at the time the decision was made. This information is set forth in the voluminous administrative record that has been provided by the Secretary. The plaintiffs have filed numerous declarations that challenge the defendants' analysis of the proposed project's impacts on the park. These declarations provide useful background information, in that they aid the court in understanding the information that is set forth in the administrative record. To the extent that these declarations attempt to challenge the information contained in the administrative record, however, they are

largely irrelevant for the purposes of these motions. Our determination of whether the Secretary abused her discretion by deciding not to perform a section 4(f) study is and must be based on the facts as they appear in the administrative record.

### 2) The Joint Planning Defense

It is undisputed that CalTrans acquired the right-of-way for the devil's slide bypass project several years before the state acquired McNee Ranch for use as a park. CalTrans' right-of-way was acquired between 1969–1972. The park land was not purchased by the state until 1981, and not turned over to the DPR until early 1984. It also appears true, as the defendants argue, that at the time the park was acquired, park planners knew there was a significant possibility that an inland bypass would be built between the two parcels of McNee Ranch State Park. The defendants therefore argue that they are entitled to summary judgment, because the " 'prohibitory' provision in § 4(f), 49 U.S.C. § 303(c), can rationally be applied only to preexisting parks, not to those which have been located adjacent to a planned highway and which have been planned to coexist with the highway." Federal Defendants' Brief at 32.

The defendants support their position with a common sense policy argument. The defendants point out that, unless there is a joint planning defense, transportation agencies will have an incentive to discourage the placement of parks near planned highway facilities. The safer course for transportation planners would be to allow park development only after highways are built, thus depriving the public of interim use of the park. Surely it is more reasonable, the defendants assert, to encourage cooperation between transportation planners and recreation planners by recognizing the joint planning defense. The defendants point to the bypass project as a shining example of the benefits of such coordination, because joint planning allowed the public to enjoy the park during the interim period before freeway construction could commence.

The short answer to defendants' arguments is that they would better be made to Congress than to this court. The statute, on its face, admits of no joint planning exception. Section 4(f) states that "the Secretary may *approve* a transportation program or project requiring the use of publicly owned land of a public park" only after a 4(f) study indicates that there are no prudent and feasible alternatives. 49 U.S.C. § 303(c) (emphasis added). Thus the relevant time frame is that of the Secretary's approval of the project, not that of the acquisition of the right-of-way. *Cf. Arlington Coalition on Transportation v. Volpe,* 458 F.2d 1323, 1335 (4th Cir.), *cert. denied,* 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972) (holding that section 4(f) is "applicable to a project until it has reached that stage of progress where the costs of altering or abandoning the proposed route would *certainly* outweigh whatever benefits might accrue therefrom, and that doubts about whether this stage has been reached must be resolved in favor of applicability"). It is undisputed that the Final Environmental Impact Statement for the bypass project was approved on April 16, 1986. *See* FEIS at i; Federal Defendants' Brief at 7. Thus final approval occurred five years after the state had acquired McNee Ranch and over two years after the park land had been formally transferred to the DPR.[1] Section 4(f)

---

1. The defendants dispute a number of the court's preliminary findings concerning the chronology of the acquisition of the park. *See* Federal Defendants' Brief at 4–5. For example, the defendants object to the court's prior order because they believe that McNee Ranch was not designated as a park in 1969. The defendants also argue that the DPR acquired the park with full knowledge of the likelihood that an inland bypass route would be built, notwithstanding the contrary declarations of former CalTrans director Adrianna Gianturco and former DPR director Russel Cahill. For the most part, the defendants' objections appear to be well-taken—certainly, they must be treated as such for the purposes of the plaintiffs' motion. Nevertheless, summary judgment for the plaintiffs is appropriate because the legally relevant time frame is that of the Secretary's *approval* of the bypass project. It cannot be disputed that at the time the project was approved, the park existed. As is discussed above, this is all that is required for section 4(f) to apply. The defendants' argu-

therefore applies if the project uses public lands.

This result was also reached in the only other reported case to deal extensively with the joint planning issue. *See Stop H–3 Association v. Lewis,* 538 F.Supp. 149 (D.Haw.1982), *aff'd in part and rev'd in part,* 740 F.2d 1442 (9th Cir.1984), *cert. denied,* 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985).[2] In *Stop H–3,* a buffer zone of park land was created between an existing park and a proposed highway project. The buffer zone was created with full knowledge of the proposed H–3 highway, and substantial efforts were made to minimize the effects of the highway on the buffer zone and the preexisting park land. Notwithstanding these facts, the project was not allowed to go forward without a section 4(f) study, because construction of the highway would have constructively used park land. The *Stop H–3* opinion makes the following observations about the joint planning defense, which we find persuasive:

Defendants contend that since the park boundaries were determined after the freeway alignment was established, the protections of 4(f) should not apply.

Their argument is not without merit. As noted above, the park design took into account the potential impacts of the freeway. In addition, ... landscaping and other measures are planned to visually shield the park from the highway. Defendants also argue that to extend coverage of the 4(f) statutes to include parks which are planned concurrently with highways would discourage the development of such parks.

While defendants' arguments are intuitively appealing, their position is contrary to the explicit statutory mandate that the Secretary not approve *any* program or project which requires the use of parkland unless the provisions of the 4(f) statutes are complied with.

*Id.* at 176 (referring to 23 U.S.C. § 138 ("the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park" without a 4(f) study)). The defendants did not appeal this part of the district court's decision. *See* 740 F.2d at 1447–48 n. 5. Interestingly, Congress later passed a law exempting the H–3 project from the requirements of section 4(f). *See* P.L. 99–

ment that the park was acquired with knowledge of the proposed bypass is therefore immaterial.

The defendants' discussion of the chronology of acquisition may also be aimed at undermining this court's prior determination that 23 C.F.R. § 771.135(g) (1984) did not validate the Secretary's decision. In our prior order we found that that regulation was inapplicable for three alternative reasons: "(1) McNee Ranch State Park was 'designated' as a park well before the land was acquired for transportation purposes; (2) the park was neither designated nor purchased 'late in the development' of the proposed bypass; and (3) the responsible federal agency did not even purport to rely upon this regulation." *Sierra Club,* 664 F.Supp. at 1334. The defendants have called into question the first basis for the court's decision: that the park was designated before the right-of-way was acquired. For the purposes of plaintiffs' motion, we must assume that this preliminary ruling was incorrect. However, the defendants have done nothing to demonstrate that the other two bases for the court's decision are inadequate. The defendants' argument therefore does not alter the result. As an additional basis for the court's decision, we note that the regulation requires

the Secretary to make adequate efforts to identify 4(f) property *prior to project approval.* Thus once again the relevant time frame is project approval, not right-of-way acquisition.

2. The defendants cite *Arkansas Community Organization for Reform Now (ACORN) v. Brinegar,* 398 F.Supp. 685, 693 (E.D.Ark.1975), *aff'd,* 531 F.2d 864 (8th Cir.1976), as contrary authority. As we noted in our previous order, *see Sierra Club,* 664 F.Supp. at 1334 n. 6, the *ACORN* decision was based primarily on a finding that the highway project in question would not constructively use any park land. *See ACORN,* 531 F.2d at 866 (stating that the court below had found that the two parks involved in that case would "not be impacted by the highway project to the extent that the environmental impacts will amount to a constructive use of the parks"). Thus the district court's observations concerning joint planning were dicta. Although the district court clearly believed that a joint planning defense would make sense, it does not appear that the district court considered the issue of whether a joint planning defense would be consistent with the language of section 4(f). Accordingly, we conclude that the *Stop H–3* decision is the only authority which has fully considered the issue of joint planning.

500, § 114, 100 Stat. 1783–349 (1986).[3] Thus our observation that the defendants should make their arguments to Congress is not an idle one.

The defendants have suggested that the failure to recognize a joint planning defense will place an insurmountable obstacle in the path of future jointly planned projects. This result is so irrational, according to the defendants, as to compel the conclusion that it was never intended by Congress. We disagree with both the defendants' premise and their conclusion. Section 4(f) does not prohibit the use of park land for transportation projects. It simply requires that, before park land is so used, the Secretary determines that there are no feasible and prudent alternatives. If at the time the Secretary approved the bypass project, there was a feasible and prudent alternative to the use of park land, the policy behind section 4(f) would favor the adoption of that alternative. The fact that the proposed project would use land of a jointly-planned park, rather than a pre-existing park, is not particularly relevant if the alternative route would use no park land whatsoever.[4] This result may discourage future joint-planning efforts, but we cannot say that it is an irrational one, especially in light of the paramount importance placed on the protection of park land by Congress, in enacting section 4(f), and by the Supreme Court in such decisions as *Citizens to Preserve Overton Park v.* *Volpe,* 401 U.S. 402, 412–13, 91 S.Ct. 814, 821–22 (1971).

### *3) Constructive Use*

■ In *Adler v. Lewis,* 675 F.2d 1085 (9th Cir.1982), the Ninth Circuit set forth the following definition of the term "use" in the section 4(f) context:

> The term "use" is to be construed broadly, not limited to the concept of a physical taking, but includes areas that are significantly, adversely affected by the project. Even off-site activities are governed by § 4(f) if they could create sufficiently serious impacts that would substantially impair the value of the site in terms of its prior significance and enjoyment.

*Id.* at 1092 (citations omitted). The defendants read this language as adopting a two-pronged test for constructive use: (1) the project must create significant adverse impacts; and (2) those impacts must substantially impair the prior use and enjoyment of the park. *See* Federal Defendants' Brief at 38–39. The defendants cite no authority for the proposition that the *Adler* opinion mandates a two-pronged test and the FEIS itself does not conduct a two-pronged inquiry. *See* FEIS at 147. The *Adler* opinion goes on to state that a site is used " 'whenever the proposed project has significant adverse [impacts].' " *Adler,* 675 F.2d at 1092 (quoting the 4(f) statement

**3.** Both parties claim that the passage of this law supports their position. According to the defendants, the law indicates that Congress believed that *Stop H–3* was wrongly decided. *See* Federal Defendants' Reply at 14 (citing Conf. Rep. 1005 to accompany H.J.Res. 738, 99th Cong., 2nd Sess., at 784 (1986)). The plaintiffs point out that Congress responded to the *Stop H–3* decision by passing a law that exempted only the H–3 project from section 4(f). Congress did not pass a more general law recognizing the joint planning defense in all cases. Thus the plaintiffs argue that Congress tacitly acknowledged the general principle behind the *Stop H–3* decision, and simply determined to override that principle for the purposes of the H–3 project. Neither of these arguments is very helpful. The fact that in 1986 Congress enacted a law exempting one jointly-planned highway/park project from the requirements of section 4(f) sheds little light on the scope of section 4(f) as originally adopted. Absent a more definitive statement from Congress, we are bound by the language of the original statute, which recognizes no exemption for jointly-planned projects.

**4.** Joint planning is most assuredly relevant to the second prong of the section 4(f) inquiry, in that jointly planned projects will more likely include "all possible planning to minimize harm to the park." 49 U.S.C. § 303(c)(2); *see Stop H–3,* 538 F.Supp. at 177. Joint planning may also be relevant to the constructive use inquiry in some cases. Jointly planned mitigation measures may reduce a project's physical impacts on park land to such a low level that there is no constructive use of park land. We have concluded, however, that this is not such a case. Thus the project is not excused from the requirements of section 4(f) by the mere historical fact that the project and the park were jointly planned.

with approval). Thus the *Adler* opinion appears to utilize a single "serious impacts" test, while stating that this test should be performed with an eye towards the prior significance and enjoyment of the park.

■ In the end, the difference between the two formulations of the *Adler* test is more semantic than substantive. Under either formulation, we conclude that the Secretary made a clear error of judgment in determining that the project did not constructively use the park. The facts *as they are set forth in the administrative record* indicate that the project would have a significant adverse impact on the park.[5] As the court's previous order noted, the aesthetic effects of a highway running between the two park parcels would in and of themselves substantially impair the enjoyment of the park. *See Sierra Club*, 664 F.Supp. at 1330–31; FEIS at 71–73. The project will also have adverse effects on the park's wildlife, plants, trails, noise level, and hydrology. *See Sierra Club*, 664 F.Supp. at 1331; FEIS at 115–142. The cumulative effect of these impacts on the park necessitates a finding of constructive use, even though we accept the defendants' contentions regarding the magnitude of the individual effects.

■ The defendants argue that the project does not constructively use the park, because the park was acquired with knowledge that a freeway might be built between the two parcels. Thus park planners must have believed that the park and the highway project could coexist. According to the defendants, the relevant baseline for the constructive use inquiry is the highway as it was planned when the park was acquired. Since the current highway proposal would have less serious impacts on the park than the project as originally planned, the current proposal *a fortiori* does not constructively use the park.

This creative argument is nothing more than an attempt to reintroduce the joint planning defense through the back door, so to speak, of the constructive use determination. For the reasons stated in subsection two above, this argument must be rejected as being inconsistent with the statutory mandate of section 4(f).

■ The defendants also argue that the DPR's decision to purchase the park land ("the negative declaration") was equivalent to a binding determination that the highway would not substantially impair the park. As the court has previously noted, this argument—on which the Secretary in part relied when making her determination, *see* A.R. 595 at 3152—is both factually and logically flawed. The DPR's negative declaration contains no analysis of the impacts of the proposed project on the park. *See* A.R. 551. At most, the DPR's decision to purchase the park land was a determination that subsequent highway construction would not be entirely inconsistent with the existence of the park. In other words, the DPR decided that even if the bypass were built the park would retain sufficient recreational value to justify its acquisition.

A determination that the park would retain *some* value after the highway was built is in no way equivalent to a determination that the construction of the highway would not substantially impair or degrade the park. The former determination is essentially a finding that the park and the highway project can coexist, i.e., that they are in some sense "compatible." *See* Federal Defendants' Brief at 51; Federal Defendants' Reply at 10. This is beside the point, as section 4(f) sets forth a much stricter standard. Section 4(f) applies to any project that would substantially impair park land, not merely to those projects that would be completely inconsistent with the presence of parks. Thus the question is

---

**5.** As is discussed below, the Secretary's conclusion to the contrary was based in part on the erroneous assumption that joint planning somehow insulated the project from the dictates of section 4(f). This assumption permeates the administrative record. *See e.g.,* FEIS at 147; A.R. 517 at 2659; A.R. 565 at 2974; A.R. 568 at 2989; A.R. 595 at 3152. To the extent that the

Secretary's decision was based on this assumption, it was not in accordance with our view of the law. To the extent, if any, that the Secretary's decision was based on a determination that, even disregarding the history of joint planning, the project would not have substantial adverse impacts on the park, we believe that it was clearly erroneous.

not whether building the bypass project would leave a residual park worth having, but rather whether building the project would substantially degrade the park as currently configured. Having concluded that it would, we hold that the plaintiffs are entitled to summary judgment on the section 4(f) claim.[6]

### 4) Remaining Issues

In light of our prior order, the plaintiffs have abandoned their claims that the defendants did not adequately comply with the administrative regulations that govern the use of federal emergency relief funds and that the defendants violated the Endangered Species Act. *See* Plaintiffs' Pretrial Statement at 37 (filed Nov. 13, 1987). Thus the only issue remaining in the case for trial is whether the FEIS was adequate. This issue would appear ripe for summary adjudication, as the adequacy of an EIS is normally judged on the face of the administrative record.

At the summary judgment hearing, the parties raised questions concerning the remedial aspects of this case. The discussion focused on whether federal funding for the project should be allowed to lapse in the event that a section 4(f) study was required. The County of San Mateo urged the court to take steps to preserve federal funds that have been designated for the Devil's Slide project. According to the County, allowing the funding to lapse would needlessly deprive it of the funds necessary to build any type of project. The plaintiffs responded that leaving the Plans, Specifications, and Estimates (PS & E) for the current proposal intact will create a strong incentive for the defendants to prepare a section 4(f) statement that simply rationalizes their prior decision to build along the proposed route.[7] The federal defendants were of the opinion that any such bias could be avoided by setting aside the PS & E for the current proposal. The court could then exercise its equitable powers to preserve funding for the project in general, regardless of which specific proposal was ultimately adopted. While we are inclined to agree that there is no compelling equitable or legal reason to allow the funding for the project as a whole to lapse, we believe that the parties are entitled to brief the issue further in light of this order.

### CONCLUSION

No material factual disputes exist that require a trial on the plaintiffs' 4(f) claim. The plaintiffs are entitled to summary judgment based on the plain language of section 4(f). After further proceedings relating to the adequacy of the FEIS are completed, this case will be remanded to the Department of Transportation so that the Secretary may determine whether prudent and feasible alternatives to the current proposal exist, and if not, whether all possible planning to minimize harm to the park has occurred.

IT IS SO ORDERED.

---

**6.** The defendants quarrel with some of the more sweeping language of the court's prior order concerning the constructive use determination. The defendants contend that aesthetics were not the "primary" reason for which the park was acquired, *Sierra Club,* 664 F.Supp. at 1330–31, and that the park is not "unspoiled wilderness." *Id.* at 1331. These attacks are directed against language that was not essential to the court's prior order. The record is replete with statements that the park's scenic qualities are a major resource, although perhaps they were not the primary motivation for the park's acquisition. *See e.g.,* FEIS at 71; A.R. 551 at 2844, 2862; A.R. 641 at 144. Similarly, the question is not whether the park is completely unspoiled in its present condition, but rather whether it would be significantly more spoiled by the addition of the bypass project. For the reasons stated in the court's prior order, *Sierra Club,* 664 F.Supp. at 1330–31, it is clear that it would be. That is all that is required to entitle the plaintiffs' to summary judgment on count two of their complaint.

**7.** In our previous order, we indicated that the PS & E for the bypass project would be set aside. *See Sierra Club,* 664 F.Supp. at 1340–42. Upon further consideration, however, we concluded that the PS & E should not be set aside until final resolution of the case on the merits. *See* Order Granting Motion for Reconsideration (filed Feb. 23, 1987).