SIERRA CLUB, et al., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, et al., Defendants.

No. C–86–3384 RFP.

United States District Court, N.D. California.

Jan. 12, 1987.

Alan Moss, Maribeth Halloran, Robert Breakstone, Breakstone & Cotsirilos, Charles D. Chalmers, Flynn, Steinberg, Dick & Lee, Robert M. Teets, San Francisco, for plaintiffs.

Paul E. Locke, Asst. U.S. Atty., Norval Fairman, San Francisco, Christine Motley, Deputy, Hall of Justice & Records, Redwoody City, Dwight Herr, County Counsel, Santa Cruz, for defendants.

## MEMORANDUM AND ORDER GRANTING PRELIMINARY INJUNCTION

PECKHAM, Chief Judge.

### INTRODUCTION

The plaintiffs in this case seek to prevent the construction of a proposed highway bypass of California State Highway Route 1 between Pacifica and Montara. This portion of Route 1 is presently a rural and scenic two-lane highway built along the cliffs overlooking the Pacific Ocean. The highway was built in 1937 on the old Ocean Shore Railroad alignment, which had been abandoned by the railroad in the 1920's. Since 1937, landslides have repeatedly forced closure of the road along a 600–foot segment of highway commonly known as Devil's Slide. The last major closure occurred for 84 days during the severe winter storms of 1982–83, when a portion of the roadbed sank five feet.

In 1958, the State Division of Highways began studying bypass alternatives for the Devil's Slide area, and in 1960, the California Highway Commission approved a 6–lane inland freeway route which left the existing Route 1 at the south end of Pacifica and rejoined it approximately 6.8 miles south at the north end of the Half Moon Bay Airport. This proposed route came to be known as the "adopted alignment alternative." Between 1969 and 1972, the California Department of Transportation ("CalTrans") acquired approximately 150 parcels of land totaling 55% of the right-of-way needed for this bypass alternative. However, the highway project was abandoned in 1972 when it was preliminarily enjoined by Judge William T. Sweigert in order to compel compliance with the newly enacted federal environmental laws. *See Sierra Club v. Volpe*, 351 F.Supp. 1002 (N.D.Cal. 1972).

In the mid–1970's, the State Department of Parks and Recreation ("DPR") began negotiations to purchase McNee Ranch State Park. During this period of time, the highway bypass project remained dormant and unfunded, but DPR was aware of the possibility that it might eventually be revived. The directors of CalTrans and DPR discussed the park and the highway project, and the director of CalTrans assured the director of DPR that the bypass would be built only if there were no other alternative. With this understanding, DPR apparently agreed not to purchase a portion of land alongside Martini Creek because CalTrans indicated that it might later be needed for the bypass. However, both

the director of CalTrans and the director of DPR understood that DPR hoped eventually to acquire the CalTrans right-of-way as part of the park. In 1978, the Public Works Board approved the purchase by DPR of the two parcels of land on either side of CalTrans' right-of-way, and by 1981 DPR had completed the eminent domain suits to acquire the land.

After the severe damage to Devil's Slide in 1983, a bill was introduced in Congress to make the highway eligible for emergency relief funds. After hearings before the House Surface Transportation Committee, the bill was passed and additional funding for eligible projects made available. In March 1983, CalTrans began preparation of a draft environmental impact statement on an expedited basis in order to meet the federal funding obligation deadline of September 30, 1986. In 1985, however, the California Coastal Commission twice disapproved amendments to the San Mateo County Local Coastal Plan which were required under state law for the adopted alignment alternative to proceed. CalTrans then abandoned the adopted alignment alternative in favor of the "preferred" or "Martini Creek alternative," which is the subject of this lawsuit. This alternative was approved by the California Coastal Commission in February 1986. The Final Environmental Impact Statement for the project was approved by the federal defendants in April 1986.

The proposed bypass at issue here is a 4.5 mile inland bypass with one lane in each direction plus a continual uphill passing lane on each side of the San Pedro Mountain saddle. At the top of the saddle cut, there would be four paved lanes for approximately half a mile, because each of the uphill passing lanes are planned to continue over the top and begin to descend before merging with the single downhill lane. There would be continuous vehicle recovery/retention areas on the downhill sides of the bypass, except at the top of the bypass and over four bridges. The width of the bypass, including vehicle recovery/retention areas, is planned to vary from 79 to 100 feet. The four paved bridges would be 56 feet wide. Total grad-

ing for the project is estimated at 5.9 million cubic yards. The bypass would take the same route along the right-of-way through McNee Ranch State Park as the "adopted alignment alternative," but it would turn west at the southern park boundary and follow the southern edge of Martini Creek to rejoin the existing Route 1 just north of Montara.

This case is now before the court on plaintiffs' motion for a preliminary injunction to prevent the defendants from: (1) advertising, awarding, or approving any bids, testing, or construction work on the highway bypass; (2) engaging in any physical intrusion on the land without further order of this court; (3) filing condemnation actions or taking any other action to acquire right-of-way; (4) expending federal funds for the project or seeking reimbursement from federal funds for work engaged in after September 3, 1986, when the parties stipulated to a temporary restraining order; and (5) seeking any further permits or approvals for this project. The plaintiffs also seek to set aside the federal defendants' approval of the Plans, Specifications and Estimates for this project. The court held a hearing in this matter on November 7, 1986, and has reviewed numerous declarations submitted by the parties as well as the voluminous administrative record.

## DISCUSSION

The Ninth Circuit has enunciated both a "traditional" and an "alternative" test for evaluating a claim for preliminary injunctive relief. Under the traditional test, the court must consider three questions: (1) Have the movants established a strong likelihood of success on the merits? (2) Does the balance of irreparable harm favor the movants? (3) Does the public interest favor granting the injunction? *See American Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 965 (9th Cir.1983). "The 'alternative' test permits the moving party to meet its burden by demonstrating either a combination of probable success and the possibility of irreparable injury or that serious questions are raised and the balance of hard-

ships tips sharply in its favor." *Id.* (citations omitted). The Ninth Circuit has also made clear, however, that the tests are " 'not really two entirely separate tests, but ... they are merely extremes of a single continuum.' " *Village of Gambell v. Hodel,* 774 F.2d 1414, 1419 (9th Cir.1985) (quoting *Benda v. Grand Lodge of IAM,* 584 F.2d 308, 315 (9th Cir.1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979)), *cert. granted,* — U.S. ——, 106 S.Ct. 2274, 90 L.Ed.2d 717 (1986). Because the differences between the formulations are insignificant, either will suffice. *See id.* Thus, we begin by reviewing the traditional three criteria for preliminary injunctive relief.

### I. *Probability of Success on the Merits*

Plaintiffs challenge the bypass on the following grounds: (1) failure to comply with § 18 of the Federal Aid Highway Act of 1968, 23 U.S.C. § 138 (1982), and § 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 1653(f) (1976) (recodified at 49 U.S.C. § 303(c) (1982)), which prohibit the use of parkland for highway purposes unless there is no feasible and prudent alternative[1]; (2) failure to comply with administrative regulations that govern the use of federal emergency relief funds; and (3) failure to prepare a sufficient environmental impact statement under the National Environmental Policy Act, 42 U.S.C. § 4332(C) (1982).

### A. *Section 4(f)*

Section 4(f) of the Department of Transportation Act of 1966 prohibits the Secretary of Transportation from approving any transportation project that requires the use of a public park of state or local significance unless: (1) there is no prudent and feasible alternative, and (2) the project includes all possible planning to minimize harm to the park. *See* 49 U.S.C. § 303(c)

(1982). The implementing regulations promulgated by the Secretary require the Secretary to prepare a written "§ 4(f) Statement" justifying any such "use" of a park. *See* 23 C.F.R. § 771.135(h), (i) (1984). The plaintiffs in this case contend that the bypass project must be halted until the defendants have prepared a § 4(f) Statement analyzing whether there are prudent and feasible alternatives to the bypass.[2]

In *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court rejected the argument that the Secretary's determinations under § 4(f) are immune from judicial review. The court noted:

> [T]he very existence of the statutes indicates that protection of parkland was to be given paramount importance. The few green havens that are public parks were not to be lost unless there were truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordinary magnitudes. If the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds that alternative routes present unique problems.

*Id.* at 412–13, 91 S.Ct. at 821–22. The Court went on to hold that the applicable standard of judicial review for agency actions under § 4(f) is whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The Court further noted that this standard does not shield the Secretary's actions "from a thorough, probing, in-depth review." *Id.* at 415, 91 S.Ct. at 823. A reviewing court must determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. at 824.

*See Fmali Herb, Inc. v. Heckler,* 715 F.2d 1385, 1387 (9th Cir.1983) (noting that legislative regulations properly issued by agencies "have the force and effect of legislation") (citing *Batterton v. Francis,* 432 U.S. 416 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977)).

---

**1.** Section 18 of the Federal Aid Highway Act and § 4(f) of the Department of Transportation Act are substantially identical, and are referred to collectively as "§ 4(f)" in this opinion.

**2.** It is well established that agencies are bound to adhere to their own "legislative" regulations.

**1330**

The defendants contend that § 4(f) is inapplicable because the proposed highway bypass does not "use" McNee Ranch State Park within the meaning of the statute. Although the Supreme Court has never specifically addressed the issue of what constitutes a "use" of parkland under § 4(f), the Ninth Circuit has established standards for this evaluation. In *Adler v. Lewis*, 675 F.2d 1085 (9th Cir.1982), the court held that a " 'site is considered "used" whenever land from or buildings on the site are taken by the proposed project, or whenever the proposed project has significant adverse air, water, noise, land, accessibility, aesthetic, or other environmental impacts on or around the site.' " *Id.* at 1092 (quoting with approval the standard recited in the § 4(f) Statement). The court specifically noted that even activities which do not make physical use of parkland "are governed by § 4(f) if they would create sufficiently serious impacts that would substantially impair the value of the site in terms of its prior significance and enjoyment." *Id.*[3]

In applying this standard, the Ninth Circuit has determined that the word "use" is to be "construed broadly." *See id.* In *Stop H–3 Association v. Coleman*, 533 F.2d 434, 445 (9th Cir.), *cert. denied*, 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 610 (1976), the court held that a highway which would "pass near" a petroglyph rock qualifying for § 4(f) protection "used" the rock within the meaning of the statute. Similarly, in *Brooks v. Volpe*, 460 F.2d 1193, 1194 (9th Cir.1972), the court concluded that a proposed highway which would "encircle" a campground "used" the campground within the meaning of § 4(f). The court in *Brooks* stated: "The word 'use' is to be construed broadly in favor of environmental statements in cases in which environ-

mental impact appears to be a substantial question." *Id.*

The most apparent impact that the proposed bypass in this case will have upon McNee Ranch State Park is aesthetic. According to the Final Environmental Impact Statement ("FEIS"), the construction of the project will require seven "cuts" into the mountains greater than 150 feet deep, with the largest cut of 250 feet at the saddle of San Pedro Mountain. The length of these cuts will vary from approximately 350 to 2100 feet. In addition, there will be a number of "fill" slopes, the largest of which would be 250 feet high. Exhibits 12–18 of the FEIS show simulations of these cuts and fills superimposed over actual photographs. The most significant visual alteration in the landscape resulting from these cuts and fills will be the saddle cut through San Pedro Mountain shown in Exhibit 12. *See* FEIS, vol. 1 at 39. The defendants concede that the cuts and fills will be visible to park visitors from various locations throughout the park. For example, campers who camp at the proposed Green Valley Campground will be able to see the saddle cut and the fill slope and bridge across Green Valley. *See* FEIS, vol. 1 at 72 & 40 (Exhibit 13). CalTrans proposes to minimize these "substantial visual changes" through revegetation of the cuts and fills, but this revegetation is not expected to be very successful for a significant portion of the cut slopes. *See* FEIS, vol 1 at 73 & Plates 7–8. Furthermore, the highway itself will remain visible from various locations within the park.

Measured against the *Adler* standard, these aesthetic impacts are in themselves sufficient to find a "constructive use" of the park. From the outset, DPR has considered the significance of McNee Ranch State Park to lie primarily in its scenic

---

**3.** In *Adler*, the Ninth Circuit recognized that an "analogy can be drawn" between the § 4(f) "use" determination and the determination that a project "significantly affects the quality of the human environment" and thus requires an environmental impact statement under the National Environmental Policy Act of 1969. *See Adler*, 675 F.2d at 1092. The Fifth Circuit has also noted that the standards under NEPA and § 4(f) "roughly are equivalent." *Citizen Advocates for*

*Responsible Expansion v. Dole*, 770 F.2d 423, 441–42 (5th Cir.1985). Although no court has unequivocally held that a § 4(f) statement must be prepared whenever the environmental impact upon a park is sufficient to trigger the preparation of an environmental impact statement, it is of some significance that the defendants here have tacitly conceded the existence of significant adverse environmental effects by preparing such an impact statement.

qualities. In its Project Acquisition Report, DPR stressed the "excellent scenic overlooks of the rugged coastline," and described the mountainous terrain as "a prominent physical feature" of the area. *See* Declaration of Olive Graham Mayer at 7–8 (quoting Report). In the San Mateo Coast Area General Plan (March 1979), DPR again commented that "[t]he scenery at the unit is quite spectacular, due to the closeness of the mountains to the ocean." *See id.* at 8 (quoting Plan). It begs credulity to suggest that a highway running right through the middle of such a scenic park would not constitute a "significant adverse aesthetic impact." There can be no doubt that the cuts and fills, as well as the highway itself, "substantially impair the value of the site in terms of its prior significance and enjoyment." *See Adler*, 675 F.2d at 1092. The bypass must therefore be found to "use" the park as that term has been construed by the Ninth Circuit.

The proposed bypass will also have significant consequences upon the recreational opportunities within the surrounding area. A number of trails throughout the park will be rerouted in order to pass under the highway at one of the four crossing points. *See* Declaration of Ernest A. Satow at 5–7. Two of these crossings will be through 12–feet wide tunnels designed also to accomodate vehicles and firefighting equipment. The other two crossings will be under the Martini Creek and Green Valley bridges. New access trails will be constructed on steep terrain on both sides of the highway for hikers to reach the Green Valley bridge undercrossing. *See* Declaration of Olive Mayer at 2–4. These changes will obviously affect the hikers' recreational experiences within the park. The unspoiled wilderness through which hikers now walk will be interrupted by the freeway, and the cuts and fills will be plainly visible.

In addition to these recreational and aesthetic impacts, the highway will have a number of other consequences for the park. Wildlife will be adversely affected by the "barrier effect" of the proposed highway, which may cause larger predators to "lose use of the habitat west of the highway." FEIS, vol. 1 at 131. The FEIS itself concludes that "[r]eduction in numbers and localized extinction of certain species would occur both on the project site *and on adjacent lands.*" FEIS, vol. 1 at 184 (emphasis supplied). The noise levels in portions of the park and at the site of the proposed Green Valley campsite will increase, although the parties greatly dispute the magnitude of the increase. The freeway will also affect vegetation and hydrology within the park. Considering all of these consequences together, there can be no doubt that the highway bypass amounts to a "constructive use" of McNee Ranch State Park.[4]

■ Despite the irrefutable evidence of substantial environmental, aesthetic, and recreational impacts upon McNee Ranch State Park, the defendants contend that § 4(f) is inapplicable because park officials were fully aware of the possibility that a bypass would be constructed when they acquired the land for the park, and because the park and highway were allegedly "jointly planned." The defendants argue that the Negative Declaration and Initial Study prepared by DPR before it purchased the park fully evaluated the proba-

---

4. Significantly, numerous agencies commenting on the proposed bypass have reached similar conclusions regarding the applicability of § 4(f). The United States Department of the Interior stated in its comments on the draft environmental impact statement that the highway "will interrupt the continuity of recreational trails connecting the two parts of the State Park, and will introduce visual (including extensive cuts and fills) and noise impacts into adjacent Park areas that will radically alter the vistas and recreational experiences presently enjoyed by visitors." FEIS, vol. II. The California Department of Fish and Game concluded that the highway would impact negatively upon wildlife throughout the area, and also disagreed with the conclusion in the FEIS that the impact of riparian loss would be adverse, but not significant. *See id.* On January 3, 1986, the Department of Parks and Recreation commented that the highway would constitute a "constructive use" of the park because of its effect upon vegetation, aesthetics, and wildlife. *See* FEIS, vol. III at 68–69. Although this conclusion was retracted in a subsequent memorandum, that memorandum did not address the environmental impacts identified in DPR's initial comments. *See* FEIS, vol. III at 62–63.

ble consequences of the highway upon the park and concluded that acquisition of the park land was compatible with the possible use of the corridor as a highway. Furthermore, the defendants point out that DPR consulted with CalTrans prior to the acquisition and specifically agreed not to purchase land south of Martini Creek because CalTrans indicated that the land might later be needed for the highway bypass. The defendants maintain that because DPR was aware that a bypass might be built, and coordinated its plans with CalTrans, the plaintiffs cannot now claim that the bypass "uses" the park within the meaning of § 4(f).

The defendants' arguments are both factually and legally flawed. First, their characterization of DPR's Negative Declaration and Initial Study is misleading. Although the document did acknowledge the possibility of a bypass, it did not evaluate the potential environmental, recreational, or aesthetic impacts of such a bypass upon the park. In fact, the document indicates that DPR hoped eventually to acquire CalTrans' right-of-way as part of the park because the highway project was at the time dormant and unfunded with no immediate possibility of being revived. *See* Negative Declaration and Initial Study, attached to Declaration of George O. Racklemann. This conclusion is supported by the declarations submitted by the former directors of both CalTrans and DPR. Both claim that they anticipated that the park would eventually include the right-of-way, and that they agreed the right-of-way would be used for the freeway bypass only if there were no other alternative. *See* Declarations of Russell W. Cahill and Adriana Gianturco. The former CalTrans director specifically states that she considered herself bound by the mandate of § 4(f) not to use McNee Ranch State Park for the bypass unless there was no prudent and feasible alternative. Thus, although the defendants attempt to paint a picture of DPR as having conclusively determined that the bypass would not "use" the park within the meaning of § 4(f), the record simply does not support this contention.

■ Furthermore, even if the defendants' contentions were factually correct, and DPR did conclude that the bypass would not substantially impair the use and enjoyment of the park, that determination would not be dispositive here. Although the Secretary of Transportation is entitled to take into account the views of other agencies, both state and federal, the statute requires her to make her own independent determination based upon all of the relevant factors. *Cf. Action for Rational Transit v. West Side Highway Project*, 536 F.Supp. 1225, 1241 (S.D.N.Y.1982) ("Even in the absence of objections from the ... agencies, the [Army] Corps [of Engineers] was under the legal obligation to make an independent evaluation of the available information...."), *aff'd*, 699 F.2d 614 (2d Cir.1983), and *aff'd in part, rev'd in part, vacated in part*, 701 F.2d 1011 (2d Cir. 1983). In this case, the Secretary's decision that the bypass would not constructively "use" McNee Ranch State Park ignores the substantial aesthetic, recreational, and environmental effects noted above. By disregarding or minimizing these effects, the Secretary has made a "clear error of judgment" that was not "based on a consideration of the relevant factors." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The court must therefore conclude that she has abused her discretion under the statute.

■ However, the County of San Mateo, in its brief as amicus curiae, has argued that § 4(f) does not apply here under the regulations promulgated by the Department of Transportation. Specifically, the County calls attention to 23 C.F.R. § 771.135(g) (1984), which provides:

Designations of park and recreation lands ... are sometimes made and determinations of significance changed late in the development of a proposed action.... [A]n action may proceed without consideration under section 4(f) if the property interest in the section 4(f) type lands was acquired for transportation purposes prior to the designation or change in the determination of significance and if an

adequate effort was made to identify properties protected by section 4(f) prior to project approval.

The court finds this regulation inapplicable for a several reasons. First, the park was in fact "designated" as a park prior to CalTrans' acquisition of the right-of-way. In the San Mateo County Parks and Open Space Element General Plan for 1990, which was adopted by the San Mateo Board of Supervisors on March 25, 1969, the land was designated as "Parks and Beaches." The General Plan and Coastal Area Plan adopted by the Pacifica City Council on September 8, 1969 also designated the land as parkland. *See* Declaration of Olive Mayer at 2 & attached Exhibits. Under the plain language of the regulation, it is irrelevant that the park was not actually acquired until after the right-of-way was established. The regulation on its face refers to parks that are "designated" after the land is acquired for transportation purposes, not to parks that are "acquired" after that time.[5]

Second, the language relied upon by the County must be read in conjunction with 23 C.F.R. § 771.135(b) (1984), which states that "any use of lands from a section 4(f) property shall be evaluated *early* in the development of the action *when alternatives to the proposed action are under study.*" (emphasis supplied). In this case, McNee Ranch State Park was both designated and acquired as a park years before alternatives to the inland highway bypass were seriously being studied as part of the environmental review process. Because the park was established well before the time when the § 4(f) determination should have been made under § 771.135(b), the park cannot be said to have been designated "late in the development of a proposed action" within the meaning of § 771.135(g). The purpose of § 771.135(g) was obviously to avoid situations in which considerable time, effort, and resources had already been devoted to a highway project before

land in the vicinity became eligible for protection under § 4(f). That situation simply is not present here because the land was purchased as a park at a time when the highway project was dormant, unfunded, and without any of the requisite environmental approvals. Thus, § 771.135(g) does not apply, and a § 4(f) determination must be made.

Finally, it is also significant that none of the defendants in this case have ever cited 23 C.F.R. § 771.135(g) (1984) as a reason that § 4(f) does not apply here, not even in the defendants' briefs before this court. Instead, it has been their position throughout the long history of this controversy that the highway simply does not amount to a "constructive use" of the park, either because the effects of the project will allegedly be minimal or because the park and highway were "jointly planned." The County's attempt to fit this case within the ambit of a regulation not even relied upon by the responsible agency must therefore be rejected. *See Tongatapu Woodcraft Hawaii, Ltd. v. Feldman,* 736 F.2d 1305, 1308 (9th Cir.1984) ("A reviewing court must judge the propriety of an agency's actions solely on the grounds invoked by the agency."); *see also Federal Power Comm'n v. Texaco, Inc.,* 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974).

In sum, the court finds that the plaintiffs have demonstrated a high probability of success on their claim that the Secretary abused her discretion by finding that the proposed bypass would not "use" McNee Ranch State Park within the meaning of § 4(f). Both the Supreme Court and the Ninth Circuit have unequivocally determined that Congress intended to provide broad protections for park lands when it passed § 4(f), and the Ninth Circuit has explicitly held that the statute "must be construed broadly in cases in which environmental impact appears to be a substantial question." *Brooks v. Volpe,* 460 F.2d 1193, 1194 (9th Cir.1972). Under this stan-

---

**5.** This interpretation of the regulation is also consistent with the Supreme Court's admonition that protection of park land must be accorded "paramount importance" under § 4(f), *see Citizens to Preserve Overton Park v. Volpe,* 401 U.S.

402, 412–13, 91 S.Ct. 814, 821–22, 28 L.Ed.2d 136 (1971), and with the Ninth Circuit's determination that the statute must be "construed broadly," *see Adler v. Lewis,* 675 F.2d 1085, 1092 (9th Cir.1982).

dard, it cannot seriously be disputed that the bypass project "uses" the park within the meaning of § 4(f). Furthermore, the defendants' characterization of the negotiations between CalTrans and DPR are both factually inaccurate and legally irrelevant. Finally, 23 C.F.R. § 771.135(g) is inapplicable here because: (1) McNee Ranch State Park was "designated" as a park well before the land was acquired for transportation purposes; (2) the park was neither designated nor purchased "late in the development" of the proposed bypass; and (3) the responsible federal agency did not even purport to rely upon this regulation.[6]

## B. Eligibility of Project for Emergency Relief Funds

The plaintiffs challenge the use of federal emergency relief funds for the bypass. The federal emergency relief statute, 23 U.S.C. § 125 (1982), authorizes an emergency federal fund for the "repair or reconstruction" of highways damaged by "natural disaster" or "catastrophic failures from any external cause." Plaintiffs contend that the defendants have violated the regulations promulgated by the Secretary of Transportation under this statute. These regulations prohibit the use of emergency relief funds to construct "replacement highway facilities" unless "it is not technically and economically feasible to repair or restore a damaged element to its predisast-

er condition." 23 C.F.R. § 668.109 (1984). Plaintiffs argue that it is technically and economically feasible to repair or restore Devil's Slide, and that the inland bypass is therefore ineligible for emergency relief.

■ The defendants respond that these regulations are inapplicable because they are superseded by subsequent legislation passed by Congress in 1984.[7] This legislation provides that:

A project to repair or reconstruct any portion of a Federal-aid primary route in San Mateo County, California, which was destroyed as a result of a combination of storms in the winter of 1982–83 and a mountain slide and which, until its destruction, had served as the only reasonable access between two cities and as the designated emergency evacuation route of one of such cities shall be eligible for assistance under section 125 of title 23, United States Code.

Pub.L. 98–229, 98 Stat. 55 (1984).

The language of this bill does not suggest that it was intended to supersede all of the prior regulations promulgated under 23 U.S.C. § 125. The legislation by its very terms provides that the project "shall be eligible for assistance" only if it qualifies as "a project to repair or reconstruct" Devil's Slide. When Congress incorporated the term "repair or reconstruct" from the emergency relief statute itself, it must be

---

6. In *Stop H–3 Association v. Lewis*, 538 F.Supp. 149, 176–77 (D.Haw.1982), *aff'd in part and rev'd in part*, 740 F.2d 1442 (9th Cir.1984), *cert. denied*, 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985), the district court reached a similar conclusion. There, the defendants argued that § 4(f) did not apply because "the park boundaries were determined after the freeway alignment was established." *Id.* 538 F.Supp. at 176. Although the court did not discuss 23 C.F.R. § 771.135(g), it found that the defendants' argument was "contrary to the explicit statutory mandate that the Secretary not approve *any* program or project which requires the use of parkland unless the provisions of the 4(f) statutes are complied with." *Id.* This part of the district court's ruling was not appealed. *See* 740 F.2d at 1447–48 n. 5.

The defendants cite what they claim to be contrary authority in *Arkansas Community Organization for Reform Now (ACORN) v. Brinegar*, 398 F.Supp. 685 (E.D.Ark.1975), *aff'd*, 531 F.2d 864 (8th Cir.1976). Although the district

court in that case did comment upon the fact that the urban park in question had been located after the freeway route had already been established, its primary basis for finding § 4(f) inapplicable was that the highway project would not substantially affect the noise and pollution levels to which park users were already subject. *See id.* at 693.

7. The defendants also contend (without much discussion in their briefs) that the plaintiffs lack prudential standing to raise this claim because they have not alleged an injury to any interest within the "zone of interests" that 23 U.S.C. § 125 was designed to protect. *See Ass'n of Data Processing Serv. Org. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *McMichael v. County of Napa*, 709 F.2d 1268, 1271–73 (9th Cir.1983). We need not reach this issue now, however, because we conclude that the plaintiffs have little likelihood of success on the merits of this claim.

presumed to have known of and approved the long-standing and consistent administrative construction of that phrase in the statute. *See United States v. Correll*, 389 U.S. 299, 305–06, 88 S.Ct. 445, 449, 19 L.Ed.2d 537 (1967); *Helvering v. Winmill*, 305 U.S. 79, 83, 59 S.Ct. 45, 46, 83 L.Ed. 52 (1938). Thus, the prior administrative interpretation of the phrase must be applied to the Devil's Slide project. However, by providing that the project to repair or reconstruct Devil's Slide "shall" be eligible for assistance, Congress must also be presumed to have removed any *other* obstacle to eligibility that might have arisen under the emergency repair statute or the regulations.[8] *See City of Edmonds v. United States Dep't of Labor*, 749 F.2d 1419, 1421 (9th Cir.1984) (" 'Use of the word "shall" generally indicates a mandatory intent unless a convincing argument can be made to the contrary.' ") (quoting *Sierra Club v. Train*, 557 F.2d 485, 489 (5th Cir.1977)). Thus, although the 1984 legislation did permit funding of the bypass without consideration of some of the eligibility requirements under 23 U.S.C. § 125, the federal defendants must be held to their own regulations construing the phrase "repair or reconstruct."

This court must therefore review the Secretary's determination that it is "technically and economically" infeasible to repair the existing Route 1 at Devil's Slide. Under the applicable regulations defining "economic justification," the Secretary "must weigh the cost of the betterment against the risk of eligible recurring damage and the cost of future repair." 23 C.F.R. § 668.109(b)(6) (1984). In evaluating the Secretary's decision, we must bear in mind that a court must defer to an administrator's interpretation of her own regulation unless it is plainly erroneous or inconsistent with the regulation. *See Razey v. Heckler*, 785 F.2d 1426, 1428 (9th Cir.1986).

■ The court finds that the Secretary's determination in this case was neither plainly erroneous nor inconsistent with the regulation. There is substantial evidence in the record to support the conclusion that the geologic instability of Devil's Slide necessitated a project of greater magnitude than simple repair or restoration of the existing highway. As the Federal Highway Administration pointed out in a September 2, 1986 memorandum concurred in by the Division Administrator: "Even the opponents to the presently planned inland alignment have offered no practical method of repair on the existing roadway." Administrative Record at 3293. Given the long history of recurrent landslides and road closures, and the undisputed geologic instability of the region, the Secretary was clearly justified in concluding that repair or restoration was technically and economically infeasible.

■ The plaintiffs' primary argument seems to be that an alternative project known as the "Marine Disposal Alternative" ("MDA") is technically and economically feasible. This project, however, is itself a relocation of the roadway, and not a repair or restoration of the existing highway. The MDA contemplates moving 4,300 feet of highway 250 feet inland, and depositing material from the slide into the ocean to form a stable base for the new roadway. Because the regulation upon which the plaintiffs rest their argument

---

**8.** This interpretation is consistent with one of the apparent reasons for the passage of the 1984 legislation, which was to bypass the administrative regulation prohibiting the expenditure of emergency relief funds to correct "preexisting, nondisaster related deficiencies." 23 C.F.R. § 668.105(a) (1984). Lawrence A. Staron of the Federal Highway Administration testified in the hearings on Devil's Slide before the House Subcommittee on Public Works and Transportation that "[f]ailures resulting from pre-existing conditions ... are not covered under this program," and that "based on the history of this particular slide, it would appear to involve pre-existing

conditions." *Emergency Highway Relief, Hearings on H.R. 4957 Before the Subcommittee on Public Works and Transportation*, 98th Cong., 1st Sess. 83, 87 (1983). One purpose of the 1984 bill was to overcome this specific administrative obstacle to the eligibility of Devil's Slide for federal funding. However, there is no evidence in the language of the statute or its legislative history that Congress also intended to abandon the regulations defining the phrase "repair and reconstruction." The fact that the various bypass proposals were discussed in the House and Senate hearings does not reflect any such intention, as the defendants seem to contend.

prohibits a relocation only if *repair* is technically and economically feasible, it is simply irrelevant if an alternative *relocation*, such as the MDA, is technically and economically feasible. The regulation simply provides no constraints on the Secretary's choice between various relocation alternatives.

The court thus concludes that the plaintiffs have failed to demonstrate a likelihood of success on the merits of their claim challenging the use of emergency relief funds. The Secretary's interpretation of her own regulations was neither erroneous nor inconsistent with the regulations, and this court must therefore defer to her decision.

## C. *Adequacy of Environmental Impact Statement*

The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. (1982), requires the preparation of a detailed environmental impact statement ("EIS") for all major federal actions significantly affecting the quality of the environment. The plaintiffs in this case contend that the EIS prepared for the Devil's Slide bypass is inadequate. Their arguments break down into four categories: (1) the EIS was not prepared with good faith objectivity; (2) the EIS fails to disclose reponsible dissenting opinions; (3) the EIS inadequately addresses a number of environmental impacts; and (4) the EIS does not contain a sufficient examination of alternatives to the proposed bypass.

NEPA imposes "essentially procedural" requirements upon affected agencies. Its goal is not to restrict the substantive realm of choices available to decision-makers, but rather "to insure a fully informed and well-considered decision" that takes into account environmental consequences. *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). Because NEPA is a procedural statute, the standard for reviewing the adequacy of an EIS is whether it was prepared "without observance of procedure required by law." Administrative Procedure Act, 5 U.S.C.

§ 706(2)(D) (1982). *See Trout Unlimited v. Morton*, 509 F.2d 1276, 1282 (9th Cir. 1974). Under this standard, a court must evaluate the EIS to determine whether

> its form, content, and preparation substantially (1) provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in the light of its environmental consequences, and (2) make available to the public, information of the proposed project's environmental impact and encourage public participation in the development of that information.

*Id.* at 1283.

> A court is not to substitute its judgment for that of the agency as to the environmental consequences of its action. Rather, this court's role is to ensure that the agency has taken a "hard look" at environmental consequences. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 [96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576] (1976). Moreover, "the test of EIS adequacy is pragmatic and the document will be examined to see if there has been a good faith attempt to identify and to discuss all foreseeable environmental consequences." *Warm Springs Dam Task Force v. Gribble*, 565 F.2d 549, 552 (9th Cir.1977) (per curiam). The adequacy of the content of the EIS is determined by a rule of reason, which requires only "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir.1974).

*Columbia Basin Land Protection Ass'n v. Schlesinger*, 643 F.2d 585, 592–93 (9th Cir. 1981). With these principles in mind, we turn to an examination of the plaintiffs' objections to the EIS and its preparation.

### 1. *Good Faith Objectivity*

■ The plaintiffs first point to circumstances surrounding the preparation of the EIS as evidence that CalTrans lacked the "good faith objectivity" that is mandated by NEPA. *See Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774, 782 (9th Cir.1980) (holding that the adequacy of

an EIS is measured by a test of objective good faith); *Save Our Sycamore v. Metropolitan Atlanta Rapid Transit Auth.*, 576 F.2d 573, 575 (5th Cir.1978) (same); *Life of the Land v. Brinegar*, 485 F.2d 460, 467 (9th Cir.1973) (same), *cert. denied*, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). Specifically, the plaintiffs have submitted the declarations of three former CalTrans employees who assert that CalTrans management deliberately changed the conclusions of its own staff regarding the environmental impacts of the proposed bypass in order to avoid the necessity of preparing a § 4(f) statement.

Two of these former CalTrans employees contend that their conclusions regarding significant adverse visual impacts were purposefully deleted by management despite the absence of any contrary evidence. They contend that CalTrans withdrew from the technical index of the EIS an Aesthetics Report prepared by its own staff, prompting the authors of the report to remove their names from the EIS. *See* Declarations of Reed Holderman and David Mayfield. The third former CalTrans employee alleges that her conclusions regarding the highway's potential for "growth inducement" were also changed by CalTrans, and that the new conclusions directly contradicted her study. Moreover, she claims that these conclusions were reached by altering the definition of "growth inducement" which she had used in every other environmental analysis she ever conducted for CalTrans. *See* Declaration of Tillie N. Blackwell.

The defendants respond that the Aesthetics Report in question was simply a draft report that had not yet been reviewed by CalTrans headquarters. They argue that the only changes made in the report before finally releasing it to the public were to delete subjective and conclusory characterizations of the visual impacts as "significant negative visual impacts." *See* Declaration of Robert H. Jahrling at 9–10. The reason for deleting these conclusions, according to the defendants, was that there was no scientific or technical basis for such a subjective evaluation, and they preferred to limit the report to a descriptive summary of the visual impacts that could be expected from the bypass.

With respect to the "growth inducement" issue, the defendants argue that the conclusions reached in Ms. Blackwell's study were altered because of dissatisfaction with her methodology, and not because she found that a bypass would be growth inducing. Furthermore, they contend that the definition of "growth inducement" was altered only because CalTrans concluded that extra highway capacity which permitted "planned growth" to occur was "growth supporting" rather than "growth inducing." *See* Declaration of Peter L. Hathaway.

Based upon these declarations alone, the court cannot conclude that the record indicates bias or bad faith in the preparation of the EIS. It is to be expected that technical reports included in an EIS will go through several drafts and numerous revisions before they are finally made public. The role of a court in evaluating the adequacy of technical reports is not to quibble with each definitional or semantic change between drafts, but rather to ensure that the final EIS provides sufficient detail to educate the public and the decision-makers. The defendants here have offered neutral and good faith reasons for rejecting the conclusions and methodology of the three former CalTrans employees who have alleged irregularities in the preparation of the EIS. These explanations are sufficient to rebut the plaintiffs' claims of bad faith and bias.

*2. Disclosure of Responsible Dissenting Opinions*

 Plaintiffs argue that even if CalTrans management was entitled to override the conclusions of its own staff, CalTrans was still obligated to disclose and respond to its staff's concerns in the FEIS. It is true that courts have held that an EIS must "set forth opposing views widely shared in the relevant scientific community." *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368 (2d Cir.1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978); *see also Committee for Nuclear Responsibility v. Seaborg*, 463

F.2d 783, 787 (D.C.Cir.1971) (holding that "responsible opposing views" in the scientific community must be included in an EIS). However, the plaintiffs have cited no case in which a court has required that an agency disclose and discuss each of the contrary views of lower-level employees assisting in the preparation of an EIS. Such a holding would impose excessively burdensome obligations upon agencies preparing impact statements, and might even serve to discourage frank discussion of the environmental issues. Thus, the court finds that NEPA does not demand the disclosure and discussion of the conclusions and personal opinions of staff members involved in the preparation of the Devil's Slide EIS who disagreed with the ultimate conclusions reached.

### 3. Adequacy of Analysis of Environmental Impacts

The plaintiffs challenge the EIS on the ground that it inadequately analyzes the project's impacts upon aesthetics, growth inducement, noise, hydrology, plant communities, wildlife, recreation, and a privately owned ranch. In reviewing the adequacy of these individual components of the EIS, we must bear in mind that the purposes of NEPA are to ensure informed decision-making and to educate the public concerning the environmental risks of proposed projects. *See Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir.1974). "The discussion of environmental effects need not be exhaustive, but rather need only provide sufficient information for a reasoned choice of alternative." *Id.* Scientific unanimity regarding the wisdom or environmental effects of a proposed project is not required, *see Citizens Against Destruction of Napa v. Lynn*, 391 F.Supp. 1188, 1196 (N.D.Cal.1975), and mere disagreement among experts will therefore not invalidate an EIS, *see Life of the Land v. Brinegar*, 485 F.2d 460, 472 (9th Cir. 1973), *cert. denied*, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *Citizens v. Lynn*, 391 F.Supp. at 1196; *No Oilport! v. Carter*, 520 F.Supp. 334, 354 (W.D.Wash. 1981). All that is required is that the EIS itself contain "[a] reasonably thorough discussion of the significant aspects of the probable environmental consequences...." *Trout Unlimited*, 509 F.2d at 1283.

Several of the plaintiffs' complaints about the FEIS relate not to its discussion of actual environmental impacts, but rather to the conclusion that various environmental consequences would be "insignificant." The plaintiffs argue that there is no evidence in the EIS to support CalTrans' conclusions that the aesthetic, vegetation, and wildlife impacts would not be significant, because the EIS itself concedes that there would be some such environmental consequences. However, these alleged deficiencies are not enough to invalidate the EIS. As noted above, the purpose of an EIS is simply to provide information that permits the public and the decision-makers to make informed choices. As long as there is enough information, analysis, and data in the EIS for the public and responsible officials to make intelligent conclusions of their own, the conclusion reached in the EIS itself is of little importance. The focus of inquiry in reviewing an EIS is not on whether its conclusions from the data and analysis are the most appropriate, but on whether the data and analysis are themselves sufficient for others to reach their own informed conclusions. In this case, the court finds that the EIS does contain a "reasonably thorough discussion" of the aesthetic, vegetation, and wildlife impacts sufficient to educate the public and responsible decision-makers.

The plaintiffs' remaining contentions regarding noise, hydrology, growth inducement, recreation, and the privately owned ranch rely heavily upon the declarations submitted by experts and laypersons who take issue with the data and methodologies used by CalTrans. These declarations are contradicted by declarations submitted by other experts on behalf of the defendants. As noted above, it is not the role of the court to resolve differences among experts. There can be no doubt that the discussion of each of these environmental impacts "could have been more extensive," *Trout Unlimited*, 509 F.2d at 1284, but it is also inevitable that "further

studies, evaluation and analyses by experts are almost certain to reveal inadequacies or deficiences." *Life of the Land,* 485 F.2d at 472. After reviewing the analysis in the EIS of each of these environmental impacts, the court concludes that the EIS contains a "reasonably thorough discussion," *Trout Unlimited,* 509 F.2d at 1283, sufficient to permit an informed choice.

Furthermore, the court notes that the plaintiffs have played an active and involved role throughout the history of this highway project, and their concerns have repeatedly been voiced and responded to in hearings and in the FEIS itself. CalTrans responded at length to comments upon the EIS submitted by the plaintiffs and by other agencies, organizations and individuals, many of whom had the same concerns as the plaintiffs. CalTrans' responses reflect a good faith attempt on the part of the defendants to identify and discuss the possible environmental consequences of the highway bypass. By soliciting and responding to extensive commentary by numerous agencies, organizations, and individuals, CalTrans has fulfilled its obligation to prepare a "reasonably thorough" EIS that informs the public and decision-makers of the probable environmental consequences of the highway bypass.

### 4. Adequacy of Discussion of Alternatives

Section 102(2)(C)(iii) of NEPA, 42 U.S.C. § 4332(2)(C)(iii) (1982), requires that each EIS contain a discussion of "alternatives to the proposed action." This requirement has been interpreted "as not requiring an agency to examine every conceivable alternative, but only those that are reasonable." *Friends of the Earth v. Coleman,* 513 F.2d 295, 297 (9th Cir.1975). "[T]he EIS need only set forth those alternatives 'sufficient to permit a reasoned choice.'" *Life of the Land v. Brinegar,* 485 F.2d 460, 472 (9th Cir.1973) (citation omitted), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). Furthermore, in analyzing the reasonable alternatives, "an EIS does not become vulnerable because it fails to consider in detail each and every conceivable varia-

tion of the alternatives stated." *Brooks v. Coleman,* 518 F.2d 17, 19 (9th Cir.1975).

The EIS for the Devil's Slide bypass considered four alternatives at length: the "adopted alignment" alternative, the "Martini Creek alignment" alternative, the "Marine Disposal Alternative," and the "no build" alternative. The plaintiffs here contend that the defendants should also have considered a repair to the existing Route 1 on a lesser scale than the MDA, or a two-lane Martini Creek alignment with only intermittent passing lanes. The County of Santa Cruz, in its amicus curiae brief, also contends that the defendants should have considered a Martini Creek alignment without continuous passing lanes.

The possibility of a repair to existing Route 1 on a smaller scale than the MDA was raised by the Sierra Club and other organizations and agencies in their comments upon the draft EIS. CalTrans responded that it had conducted studies showing that Devil's Slide was part of an enormous land slide which extended far above most of the roadway. Based upon these studies, CalTrans concluded that it was infeasible to repair the existing alignment on a lesser scale than the MDA. *See* FEIS, vol. II (Response #1 to March 2, 1984 comments of California Coastal Commission). The court finds that CalTrans had sufficient scientific substantiation for this conclusion to justify its decision not to include this alternative in the FEIS.

With respect to the possibility of a Martini Creek alignment without a continuous passing lane, the plaintiffs argue that § 30254 of the California Public Resources Code provides a legislative preference for maintaining Route 1 as a scenic two-lane road. However, the California Coastal Commission has already determined that the proposed bypass is consistent with § 30254, and it is not within this court's jurisdiction to overturn that finding. Furthermore, because the Martini Creek alignment without continuous passing lanes is simply a "variant" of the proposed bypass, it does not require independent consideration in the EIS as an additional alternative. *Cf. Brooks v. Coleman,* 518 F.2d 17, 19

(9th Cir.1975) (finding that a "German viaduct design" for a planned highway was "simply a variant of the viaduct-type alternatives that were adequately described in the EIS"). After reviewing all of the various alternatives rejected by CalTrans, as well as the discussion of alternatives in the FEIS, the court finds that the FEIS adequately addresses all of the reasonable alternatives to the Martini Creek inland bypass.

*II. Balance of Harm*

The second prong of the "traditional" test for preliminary injunctive relief requires the court to evaluate whether the balance of irreparable harm favors the movants. In the Ninth Circuit, irreparable harm is presumed when an environmental statute is violated, *see Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1250 (9th Cir.1984), and the court has therefore held that "injunctive relief is the appropriate remedy for a violation of an environmental statute absent rare or unusual circumstances." *Village of Gambell v. Hodel*, 774 F.2d 1414, 1423 (9th Cir.1985), *cert. granted*, —— U.S. ——, 106 S.Ct. 2274, 90 L.Ed.2d 717 (1986). The court has recognized the existence of rare or unusual circumstances justifying the denial of injunctive relief where such relief would interfere with long-term contractual relationships, *see Forelaws on Board v. Johnson*, 743 F.2d 677, 685 (9th Cir.1984), *cert. denied*, —— U.S. ——, 106 S.Ct. 3293, 92 L.Ed.2d 709 (1986), or where irreparable harm to the environment would result if such relief were granted, *see Thomas v. Peterson*, 753 F.2d 754, 764 n. 8 (9th Cir.1985); *American Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 966 (9th Cir.1983); *Alpine Lakes Protection Soc'y v. Schlapfer*, 518 F.2d 1089, 1090 (9th Cir.1975).

The defendants in this case make no argument that injunctive relief would interfere with any established contractual relationships or present any threat of actual damage to the environment. Instead, they simply contend that the economic cost of delaying the project poses a substantial hardship to them. However, the costs of delay plainly do not constitute "rare or unusual circumstances" justifying the denial of injunctive relief. Thus, the balance of harm in this case mitigates in favor of some form of preliminary injunctive relief.[9] Nonetheless, the defendants further contend that, even if some form of injunctive relief is warranted, the court should deny the plaintiffs' request to set aside the federal defendants' September 2, 1986 approval of the Plans, Specifications and Estimates ("PS & E") for the project. According to the defendants, the federal funds for this project had to be authorized on or before September 30, 1986, and if this court were to set aside the PS & E, those funds would be deobligated with little or no chance of ever being reobligated. The defendants maintain that this series of events would virtually assure that the Devil's Slide bypass would not be constructed in the foreseeable future.

Despite the appeal of this argument, the court finds that injunctive relief setting aside the PS & E approval is nonetheless appropriate. It is undisputed that the PS & E for this project was approved by the federal defendants without notice to the plaintiffs one day prior to the hearing before this court on the motion for a temporary restraining order. The conclusion is inescapable that the federal defendants acted when they did, four weeks before the final deadline for federal approval of the project, in order to present the court with a

---

**9.** Even without relying upon the Ninth Circuit's presumption in favor of preliminary injunctive relief, the court finds that the plaintiffs would suffer irreparable harm if the project were permitted to proceed. The potential harm to the plaintiffs in permitting land acquisition, contracting, testing, and construction to proceed in violation of § 4(f) are set out in full in the plaintiffs' complaint at paragraphs 30, 40, 42, 57, 58, and 87–90, as well as in their briefs. In

addition, the plaintiffs correctly point out that it will be increasingly difficult and costly to abandon the project if its momentum is permitted to build. *Cf. Arlington Coalition on Transp. v. Volpe*, 458 F.2d 1323, 1327 (4th Cir.), *cert. denied*, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972); *Keith v. Volpe*, 352 F.Supp. 1324, 1355 (C.D.Cal.1972), *aff'd*, 506 F.2d 696 (9th Cir. 1974), *cert. denied*, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975).

fait accompli and thereby escape the effect of an injunction preventing them from taking the necessary action to secure funding. Where a defendant with notice in an injunction proceeding completes an act sought be enjoined by the plaintiff, the court has the authority to issue a mandatory injunction restoring the status quo. *See Porter v. Lee,* 328 U.S. 246, 251, 66 S.Ct. 1096, 1099, 90 L.Ed. 1199 (1946); *F. Aldrette Gen. Contractors v. United States,* 715 F.2d 1476, 1480 (Fed.Cir.1983).[10] In this case, the action taken by the federal defendants on September 2, 1986 was itself violative of § 4(f), because the statute forbids the Secretary to "approve" any transportation project that impermissibly uses a public park. Thus, adhering to the Ninth Circuit's admonition that irreparable harm is presumed when an environmental statute is violated, the court finds that a mandatory injunction restoring the status quo is warranted.

Nor is the court swayed by the defendant's protestations that federal funding for the project will be jeopardized by the preliminary injunction. Federal officials have already once been preliminarily enjoined from granting federal financial aid for this very project because they failed to comply with the applicable environmental statutes. *See Sierra Club v. Volpe,* 351 F.Supp. 1002, 1011 (N.D.Cal.1972). In *Sierra Club v. Froehlke,* 359 F.Supp. 1289 (S.D.Tex. 1973), *rev'd on other grounds,* 499 F.2d 982 (5th Cir.1974), the court enjoined the approval of federal funding in order to compel compliance with NEPA despite similar contentions by the defendants there that the funding would thereby be lost forever. The court convincingly rejected the defendants' arguments, holding that just because "future funding of a project may be imperiled or placed in doubt by a

delay is not sufficient reason to alter the rule." *Id.* 359 F.Supp. at 1331. Furthermore, in this case, the court's determination that § 4(f) has been violated is unlikely to be altered by the presentation of further evidence at trial because the full administrative record upon which the Secretary based her decision has already been presented to the court, and because the issue involves primarily a legal question. Thus, the court finds that the second prong of the "traditional" test for preliminary injunctive relief weighs in favor of granting the plaintiffs' requests.

### III. The Public Interest

The final consideration under the "traditional" test for preliminary injunctive relief is whether the public interest would be served by the injunction. On the plaintiffs' side of the ledger, the Supreme Court has clearly articulated the public interest that Congress intended to protect when it passed § 4(f): "The very existence of the statutes indicates that protection of parkland was to be given paramount importance." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971). The public interest in preserving the "few green havens that are public parks," *see id.,* must obviously be accorded great weight in order to give effect to the congressional policy embodied in § 4(f). In addition to the inherent value of preserving wilderness areas in their natural state, § 4(f) was designed to ensure that the public would continue to enjoy the recreational and wilderness experiences available in an unspoiled environment. For these reasons, there is an important public interest to be served by granting the injunctive relief sought here.

On the defendants' side of the ledger, there is arguably an important public inter-

---

**10.** The Ninth Circuit has recently held that, where the effect of a mandatory injunction is equivalent to the issuance of mandamus, it must be governed by similar considerations. *See Fallini v. Hodel,* 783 F.2d 1343, 1345 (9th Cir.1986). Mandamus is available where: (1) the plaintiff's claim is clear and certain; (2) the duty of the officer is ministerial and so plainly prescribed as to be free from doubt; and (3) no other adequate remedy is available. *See id.* This

court is convinced that these conditions are satisfied here because: (1) it is "clear and certain" that the bypass will "constructively use" McNee Ranch State Park within the meaning of § 4(f); (2) the applicable regulations plainly prescribe the preparation of a § 4(f) Statement in such situations; and (3) there is no other adequate remedy for the Secretary's violation of the statute.

est in highway safety. However, the Supreme Court also made clear in *Overton Park* that Congress intended the policies underlying § 4(f) to be sacrified only if "there were truly unusual factors present in a particular case or the cost or community disruption ... reached extraordinary magnitudes." *Id.* In this case, the preliminary injunction would simply prohibit the defendants from pursuing the bypass project until a § 4(f) Statement is prepared. Once that is accomplished, the project may be permitted to proceed if there is no feasible and prudent alternative, or the defendants may begin work on whatever feasible and prudent alternative exists. Thus, the period of delay during which there will exist possible safety problems is entirely in the defendants' hands. Furthermore, whether such safety problems will in fact arise during that period of time is at present a matter of pure speculation. Finally, it is also significant that the present road along Devil's Slide would be used during construction of the inland bypass even if no preliminary injunction were issued. Thus, the court concludes that the asserted public interest in highway safety does not outweigh the public interest in protection of parks underlying § 4(f).

## CONCLUSION

The court finds that the plaintiffs have shown a high probability of success on their § 4(f) claim, the balance of harm tips in their favor, and the public interest would be served by granting injunctive relief. Furthermore, under the "alternative" test for preliminary injunctive relief, the court concludes that the plaintiffs have demonstrated a combination of probable success on the merits and possibility of irreparable harm that justifies the issuance of a preliminary injunction. Thus, the plaintiffs' requests for injunctive relief are granted, and the defendants are ordered to set aside the approval of PS & E for the Devil's Slide bypass within seven days of the date of this order.